279 N.J. Super. 566 (1995)
653 A.2d 1145
IN THE MATTER OF THE PROTEST OF THE AWARD OF THE ON-LINE GAMES PRODUCTION AND OPERATION SERVICES CONTRACT, BID NO. 95-X-20175.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1995.
Decided February 17, 1995.
*573 Before Judges BRODY, LONG, and ARNOLD M. STEIN.
Clive S. Cummis argued the cause for appellant Autotote Lottery Corp. (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, attorneys; Mr. Cummis, of counsel; Kenneth F. Oettle and Paul P. Josephson, on the brief).
Joel H. Sterns argued the cause for appellant GTECH Corp. (Sterns & Weinroth; Skadden, Arps, Slate, Meagher & Flom; and Williams & Connolly, of the Washington, D.C., bar, attorneys; Mr. Sterns, of counsel; Mark D. Schorr, on the brief).
Patrick D. Kennedy argued the cause for respondent Automated Wagering International, Inc. (McCarter & English; Picco, Mack, Herbert; and Oppenheimer, Wolff & Donnelly, of the New York Bar, attorneys; Christopher W. Jones, of counsel; William T. Reilly and Mr. Kennedy, of counsel and on the brief; Maeve E. Cannon, Sean Byrnes and James E. McGuire, on the brief).
Deputy Attorney General Ellen M. Casey argued the cause for respondent Treasurer (Deborah T. Poritz, Attorney General of *574 New Jersey, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Casey, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
This appeal arises out of the State Treasurer's award of a five-year contract to respondent, Automated Wagering International, Incorporated (AWI), for equipment, materials and services to implement and operate the on-line gaming system of the New Jersey State Lottery Commission. Appellants, GTECH Corporation (GTECH), the incumbent vendor, and Autotote Lottery Corporation (Autotote), challenge the Treasurer's determination that AWI's bid conformed to the Request for Proposals (RFP). Autotote also challenges the Treasurer's decision that its bid was non-conforming. We reverse the determination that AWI's bid was conforming, affirm the determination that Autotote's bid was non-conforming, and remand the case to the Treasurer to decide whether to award the contract to GTECH or to rebid it.

I

A. The RFP
On August 9, 1993, the Division of Purchase and Property issued an RFP for On-Line Games Production and Operation Services, Division of Lottery, Contract No. 95-X-20175. The 250-page RFP contained many requirements; only those which are relevant to this appeal will be set forth.

1. Terminals and Customer Display
The technical section relating to terminals stated that: "The Contractor must provide terminals that meet the requirements as specified below." Those requirements included:
The Contractor must provide (a) customer visual display unit(s), for each on-line Agent location. Due to the wide diversity of space in Agent locations, the visual display unit may be terminal mounted in some locations, or mounted elsewhere (wall, pole, window, etc.) in others. All unit messages must be clearly visible from *575 fifteen feet (15') by customers. Special features (scrolling, flashing, etc.) are welcomed and must be described fully.
[RFP § 6.3.2 (emphasis added).]
The purpose of a customer display visible from fifteen feet is advertising. It is meant to catch the attention of other individuals at the premises at which lottery tickets are sold and induce them to buy. Each bidder had to

respond to this section by addressing each and every portion of subsection 6.3 of the RFP, entitled, "Terminals." The response must ensure fulfillment of the Scope of Work. In doing so, the bidder must ensure that all terms cited below are incorporated in his response.

Bidders must provide complete documentation on the terminals proposed, including pictorial exhibits and the technical specifications for the terminal equipment including, but not limited to, the functional capabilities and physical and environmental characteristics for each proposed terminal.
[RFP § 7.5.2 (emphasis added).]
In addition, the bids had to clarify which terminal features were included and which were excluded from the basic bid price.

2. Implementation and Backup
RFP § 6.9 incorporated a "Big Bang" approach to convert from the current lottery system to the new system. "Big Bang" was defined as:
A form of terminal network conversion in which the new agent terminals are installed gradually in retail locations but do not take over sales until a complete cutover following the last sales day on the existing Contract. All new agent terminals go into production on the same day. The old terminal can then be removed from the premises.
[RFP § 4.0.]
RFP § 6.9 further explained that the new contractor's secondary site would be used to stage and test the new system, and that operations would proceed from November 24, 1994, supported only by that site until the primary site could be fitted out and installed. The RFP envisioned that the remote backup location would serve as the primary site for the first six months of implementation. During that period, GTECH, the incumbent vendor, would remove its equipment now located adjacent to Lottery headquarters in Lawrenceville, and the new vendor would prepare and install the central processing systems that would eventually become the *576 primary operations site. In other words, when the primary site became operational, the secondary site was to assume its original backup function.
During the conversion when the secondary site was initially operating the Lottery, RFP § 6.9 required:
For the period between November 24, 1994, and the availability of the data center at Lottery Headquarters as the primary site, the Contractor must provide sufficient backup capabilities equal to the current contingency plan: A hot backup system for the active primary system, and the ability to restore service within seventy-two (72) hours following a disaster at the single processing site.
RFP § 6.9 also required each bidder to propose a specific implementation plan for conversion, with a detailed discussion of, among other things, the installation and testing of the system's hardware and software components and the training of agents and Lottery personnel. Specifically, RFP § 6.9 stated:
If the Contractor proposed (an) alternative(s) to the specified implementation approach and schedule, it (they) must meet or exceed all the requirements specified in the RFP resulting in this Contract.
The Contractor is required to carry out their proposed implementation plan. The plan must detail hardware production capability, software development, and installation and testing of hardware and software components.
The implementation plan must also detail the structuring of the network and the installation of the network through the combined efforts of the communications carrier, the State, and the Contractor....
Among other things specifically required to be included in the implementation plan were plans for: production and installation of the hardware; upgrade of the communications network; design, development, installation and testing of software; and on-site installation and transition methodology. Also required were personnel training plans and a delineation of the breakdown of responsibility between the contractor and the State.
The preparation and submission instructions relative to implementation, like the instructions relative to terminals, mandated that the "bidder must respond to this section by addressing each and every portion of subsection 6.9 of the RFP." This included the details of the bidders plan to achieve the aims of the RFP. Alternative plans were permissible so long as they met or exceeded all installation and testing requirements of the RFP, and could *577 be shown to be otherwise favorable when compared to the envisioned approach.

3. General Provisions
Among the general provisions of the RFP were the following:

Failure to furnish all required information or to follow the proposal format specified in this RFP may disqualify a proposal. However, the Director of [the] Division of Purchase and Property may waive any nonmaterial deviation in a proposal. The Director's waiver of a nonmaterial deviation shall in no way modify the RFP requirements or excuse the proposing bidder from full compliance with the contract requirements if the proposing bidder is awarded the Contract resulting from this procurement.
[RFP § 3.18 (emphasis added).]
RFP § 3.25 (emphasis added) stated in part:
Bidders who submit a proposal in response to this RFP may be required to give an oral presentation of their proposal to the State. The purpose of such a presentation is to provide an opportunity for the bidder to clarify or elaborate on his proposal. Original submissions cannot be supplemented, changed or corrected in any way.

The general proposal preparation and submission instructions section stated:
The bid response proposal is the State's primary vehicle for obtaining essential information on which contract award decisions are based.
Bidders are cautioned that their failure to submit the information required may result in a determination that the bidder's proposal is non-responsive to RFP requirements.
....
All instructions contained in the RFP should be met in order to qualify for consideration for award. Proposals which do not meet or comply with all instructions may be considered non-responsive.
[RFP § 7.1 (emphasis added).]
For instructions as to proposal contents and evaluation, RFP §§ 7.3 and 8.4 (emphasis added) provided:
Each bidder is expected to provide the Lottery with information, evidence and demonstrations which will make possible the selection of the bidder to be awarded the Contract in accordance with N.J.S.A. 52:34-12(d) [now (f)].... Bidders are given wide latitude in the degree of detail they offer or the extent to which they reveal plans, designs, systems, processes and procedures. At a minimum, proposals must be fully responsive to the specific requirements stated in this RFP. All proposed hardware and software features must be included in the final delivered *578 system unless specifically excluded by the Lottery. Each proposal must identify any requirement of this RFP the bidder cannot satisfy.
The bidder must be completely clear about which capabilities and services are integral to the bidder's offering, which are optional at no additional cost, and which are optional at additional cost.
....
Proposals are required to meet all submission requirements as stated in Section 7; to signify compliance with all terms and conditions in the RFP; and, to meet all technical mandatories identified in Section 6. Proposals which fail to do so may be rejected.

B. AWI  Agent Terminals and Customer Displays
The general section of AWI's bid referring to terminals declared, by way of introduction and summary, "[AWI] is proposing an innovative solution to every terminal requirement specified by the New Jersey State Lottery in its RFP."
According to the bid, included is "[t]he Ovation Agent Terminal, a lightweight modular unit with what we believe to be the industry's fastest ticket printer." Ovation included
a basic model, the Ovation Deluxe, and the Norway model ..., now named the Ovation Ultra, which includes as a standard item, the OSR [optical scanner reader] noted above. In between are options for the keyboard, reader, operator display, printer, customer display and reader that cater to the specific needs of every Lottery.
[AWI Proposal § 7.5.2 (emphasis omitted).]
"The Ovation is composed of small, modular units, while its competitors' consist of one large, all-in-one unit.... [T]he three modules which comprise the Ovation Terminal are (1) a printer/power supply, (2) a keyboard/display, and (3) a media reader." AWI Proposal § 6.3.2.1.1. A picture of the proposed Ovation Agent Terminal was included in the bid.
Section 7.5.2 of the bid further declared that the Ovation would support a customer display and that many options were available:
AWI can provide, and the Ovation Terminal will support, a multiple-monitor display. Up to 12 monitors can be connected to the MasterLink System through an Ovation Terminal which would serve as their controller.
Specifically as to agent on-line terminal hardware, § 6.3.1 of AWI's proposal stated "Automated Wagering International is *579 proposing its Ovation Agent Terminal to satisfy all requirements of the New Jersey State Lottery." In § 6.3.2, AWI listed and described its agent terminal attachments. As to customer displays, § 6.3.2 (emphasis added) of the proposal stated:
A. Customer Display
The AWI Ovation Agent Terminal proposed for the New Jersey State Lottery includes a one-line 16-character alphanumeric liquid crystal (LCD) screen designed to provide message readability for lottery customers [hereinafter, AWI's "personal display"].
The customer display is mounted on the back of the terminal's operator display, which in turn is mounted on a pole attached to the keyboard.
This customer display has proven to be a significant enhancement for Norway's Norsk Tipping, where it is used with AWI's Ovation Terminals installed there.
Optional capabilities are described in Subsection 6.3.2.1.3.H.
AWI's original bid proposal did not contain a representation that the customer display could be read from fifteen feet away.[1]
AWI's proposal included an optional customer display unit which was not a feature included in the base rate. Section 6.3.2.1.3.H (emphasis added) read:
An optional four-color light-emitting diode (LED) display, visible for up to 100 feet, can be attached to the Ovation Terminal in place of the customer display described in Subsection A above. This display supports text and graphics that scroll, rotate, expand and flash, and can be physically attached to the terminal or mounted remotely. It is sure to catch the eye and grab the attention of any customer in an agent's establishment. It provides an efficient method to announce anticipated Pick-6-Lotto jackpots and other information the Lottery may wish to publicize.

The cost of this optional display was $1250 per unit, which would add a total of $6,541,600 to the bid price ($1258 times 5200 terminals).

C. Autotote  Implementation and Backup
As part of the general section on central systems, § 1.0 of Autotote's bid addressed reliability considerations and stated: "All critical elements are backed up." However, the implementation *580 section of the bid (§ 8.0) did not include any hot backup plan in case the on-line computer system failed during the implementation and conversion period. Instead, the bid stated:
8.2 Installation and Acceptance Testing
AUTOTOTE acknowledges its understanding and compliance with the Lottery installation and acceptance testing requirements.
....
8.2.1 Secondary Site Operational Schedule
Consistent with the requirements of the RFP, [Autotote] will provide for the availability of the Secondary site facilities, computer hardware, communications hardware, software, and at least ten (10) locally-connected test terminals installed and operational by August 15, 1994.
Autotote's outline of a disaster recovery and contingency plan mirrored the general RFP requirements and explained that Autotote had commitments from third-party vendors to ship replacement hardware and telecommunications equipment within a specified number of hours after notification of a man-made or natural disaster. Those pages referenced "a backup" site or facility; however, no mention was made as to whether this plan would be in effect during the implementation phase.

D. The Bid Evaluation Process
By the October 20, 1993 deadline, Autotote, AWI & GTECH had submitted bid proposals as follows: GTECH, $112,426,815; AWI, $110,180,482; and Autotote, $100,957,977. Thereafter, an Evaluation Committee conducted a technical review of the bids for the Division. The Committee was comprised of representatives from the Division of State Lottery, the Office of Telecommunications and Information Systems, and the Division of Purchase and Property. In November 1993, as part of its review, the Committee visited each of the bidders. Each firm was given sixteen hours to demonstrate its proposed system and to "provide clarification information concerning its proposal." Additionally, each firm responded to written and oral questions submitted by the Committee. The Committee visited AWI on November 11, 12 and 15. During the visits, AWI presented the evaluators with an Ovation Terminal equipped with three customer displays: the on-line *581 personal display and the optional display visible from 100 feet which were included in the original bid proposal, and a third display visible from fifteen feet.
After AWI presented the three customer display models during its demonstration, the Committee asked AWI to clarify which display was included in its base price. AWI's chief executive officer responded on November 15, 1993, in a letter, which read in part (emphasis added):

Question: Clarify which customer display is provided in the base price.

Answer: As stated in the New Jersey State Lottery RFP, "The contractor must provide visual display unit(s)...." As indicated in our response, the Ovation Retail Agent Terminal is capable of supporting multiple customer displays and monitors. The purpose of this unique design is to allow support for displays which meet the range of retail point-of-sale needs. Specifically, the one-line 16-character LCD screen attached to the back of the terminal's operator display provides transaction sales information to customers at the counter, such as transaction price, winner/loser, etc. While capable of also displaying promotional messages to customers at or nearby the counter, this is not its primary use. A larger counter-top customer display capable of being remotely programmed, displaying promotion messages, and readable at a minimum distance of 15 feet is also supported by the terminal. AWI will provide these displays and fulfill the RFP requirement, as stated in our RFP response 6.3.1 that the Ovation terminal meets all requirements. These displays provide an exciting POS [point-of-sale] package and have demonstrated their effectiveness as a key component of successful POS programs. Both displays are included in the base price.

The Ovation terminal also supports a full-size LED display capable of being seen at 100 feet. This display can be attached to the terminal or supported on a stand-alone pedestal. Several stand-alone pedestal configurations were also displayed at the site visit on November 10. These LED displays are ideal for window or street front display. Such a LED display is an option as described in our proposal section 6.3.2.1.3(H) and in our answer to New Jersey State Lottery question number 13.
The Committee visited Autotote on November 17, 18 and 19. A representative of Autotote gave a verbal presentation on the specific topic of implementation. Although some of the questions addressed conversion and implementation, none asked whether Autotote would at all times have hot backup at the secondary site during conversion. Nor did the Committee ask about Autotote's ability to restore service within seventy-two hours following a disaster at the single processing site. In its answers to the *582 Committee's questions, Autotote never made specific reference to any backup capabilities or disaster recovery plan that would be operational during the implementation phase.
During the committee review, a list of eight defined criteria was used to evaluate each proposal. From these individual criteria, the Committee computed total technical scores on a 4200-point scale. GTECH received a total score of 3720; AWI, 1940, and Autotote, 1760. Based on its results, the Committee declared that "in every evaluation area, [GTECH] offered the most advantageous contracting opportunity to the State, price and other factors considered."
As to AWI's bid, the Committee found that the proposal met the basic bidding requirements, but contained flaws which posed some risks to the Lottery, especially with regard to its proposed terminals and printers. Therefore, the Committee did not view AWI's proposal to be the most advantageous offer to the State. In a supplemental report, the Committee concluded that, unlike both GTECH and Autotote, AWI's proposal, in fact, did not meet the requirements of RFP § 6.3.2.A:
The standard liquid crystal display screen (LCD) on the OVATION DELUXE, which is mounted on the back of the operator terminal, is not visible from fifteen (15) feet, nor is it programmable from a management terminal. Optional display capabilities were offered, at additional cost.
....
... AWI's inability to meet the RFP specifications in this area, was a noted weakness.
The Committee explained the importance of display unit customer visibility to the Lottery:
The significance of an effective point-of-sale (POS) message display unit cannot be underestimated. The ability of the Lottery to provide player service messages and promotional announcements will contribute greatly to sales and marketing programs. The capability of a bidder to provide this application, in broad (full network) and specific (limited market segments) terms is an important feature of Lottery marketing plans.
The Committee technically scored terminals separately from the other equipment necessary for system operation "because they are such a significant component of the hardware required."
*583 Rejecting AWI's statement in its November 15, 1993 letter that the larger counter-top customer display, visible at fifteen feet, was included in its proposal's base price, the Committee did not consider that display as part of AWI's original proposal because the terminal attachment customer display portion of AWI's proposal was "silent" on that feature. Because the issue of bid conformity was ultimately one for the Treasurer, despite its conclusion as to AWI's non-conformity, the Committee went on to score AWI, but scored it much lower than the other bidders in terms of terminals.
As to Autotote's bid, the Committee found that the proposal met most of the bidding requirements, but contained "significant omissions," especially with respect to the conversion process. According to the Committee, the bid did not contain a detailed implementation plan for converting from the existing system to the new on-line system, but merely some sketchy statements about the process that mirrored the language of RFP § 6.9 (emphasis added):
AUTOTOTE has had little recent experience in the implementation and conversion of a lottery system....
....
Although the proposal provided a milestone chart for specific implementation dates ..., RFP Section 6.9 requires that the implementation plan include specific details on these items. The milestone chart just lists the task that will be performed by a specific date. It does not include detail on how the task will be accomplished. Without these task details, the Committee was unable to evaluate the procedure AUTOTOTE will take during the conversion.

The Committee believes that AUTOTOTE's lack of experience in recent implementation and conversions, in conjunction with the proposal's failure to detail the process, necessitated a poor rating for system implementation.
Thus, the Committee scored Autotote lower than the other bidders in terms of implementation and conversion evaluation.
Although the Committee found that the quality of Autotote's bid was "fair, overall," it concluded that the proposal was "a para-phrase of the RFP and, in many cases, devoid of specific detail for the RFP requirements." That lack of detail led the committee to conclude that "the Autotote proposal presents a risk of delayed *584 conversion and implementation, to the detriment of Lottery operations and State revenue."
In a supplemental report, the Committee found that, contrary to the requirements of RFP § 6.9, Autotote's proposal did not expressly include any contingency plan or backup capability in case Autotote's interim on-line computer system failed during implementation and conversion:
Specifically, the proposal offered no solution to the seventy-two (72) hour failover contingency plan requirement during conversion.
As was delineated above, the contractor was to provide for service restoration within a period of not more than "seventy-two (72) hours following a disaster at a single processing center." This requirement applies specifically to the processing center (primary/backup) during the time when the backup site is operating as the primary (... approximately six (6) months). In the event of a system failure at the processing center during this phase of implementation there is no solution proposed by AUTOTOTE as to how this situation would be remedied. Furthermore, the serious risk associated with this situation is compounded because AUTOTOTE offers no system CPU as backup to the single CPU at the site. Specifically, the site configuration represented in the bidder's response did not address the hot-backup requirement necessary.
As to GTECH's bid, the Committee scored the proposal highest in each of the evaluation categories, and found that the proposal met all of the RFP's requirements and posed the least risk to the Lottery. Based on its review, the Committee unanimously recommended that the award be made to GTECH, because "it would best ensure the stability and growth of the revenue stream provided by the Lottery," and because it had proposed the most comprehensive solution to all of the RFP requirements.

E. Awarding the Contract
At a meeting of the Lottery Commission on April 21, 1994, a motion to endorse the Evaluation Committee's report failed to garner a majority of votes. Nevertheless, the Commission members voted to submit the Evaluation Committee's report to the Director without recommendation.
On May 11, 1994, after her review of the Committee's report and its supplemental memorandum, the Director adopted the findings of the Evaluation Committee, but "revis[ed] some of the *585 Committee's conclusions." She stated that, based on the Committee's report, "the bids of AWI and [GTECH] are sufficiently responsive, but that the bid of Autotote is materially unresponsive to key requirements of the bidding specifications."
Like the Committee, the Director noted that Autotote had failed to include certain items in its proposal, contrary to the RFP. The "most critical" of these deficiencies was the fact that Autotote had not included a contingency plan or backup capability in case its interim on-line computer system failed during the conversion process. The Director believed that this deficiency, "by itself, seems to render the bid materially unresponsive." She concluded that one system failure without backup could cost the Lottery more than the difference between Autotote's and AWI's bid prices, and "might damage the public's confidence which is the foundation of the Lottery's business." Accordingly, she found that Autotote's proposal was "unresponsive" to the RFP, because it did not give sufficient assurance that the Lottery could continue to operate without interruption during conversion.
Without addressing the issue of customer display visibility, the Director held that AWI was "the lowest, responsive, responsible bidder," and decided to award the contract to that firm. She explained:
The risks attendant on AWI's bid do not seem so clear, have not been so clearly established by the Committee, and do not seem to rise to the level of unresponsiveness. Therefore, consistent with the Treasurer's recent directive that price should be given greatest weight compared with all other factors, the Committee's concerns with AWI's bid do not seem sufficient to overcome AWI's status as low bidder compared to [GTECH].
Thereafter, the two unsuccessful bidders filed protests. On August 11, 1994, Kenneth D. Merin, Esquire, was appointed hearing officer by the Treasurer to review and report on the merit of the protests. Hearing Officer Merin held an informal hearing on five days between August 23 and September 27, 1994. On October 27, 1994, Merin issued a report finding that a sufficient basis existed to support the Director's preliminary award to AWI.
*586 Merin declared that all three vendors were capable of operating the Lottery system and found that the Committee's highest technical rating to GTECH was "fully merited." He stated: "While a portion of its [GTECH's] higher grade may be due to its incumbency as the current Lottery vendor, the overall completeness of its proposal was superior to either of its competitors. More importantly, the quality of the product offered by [GTECH] was exceptional." In addition, Merin agreed with the Committee that both AWI and Autotote should have been rated lower than GTECH. However, Merin disagreed with the extent to which AWI's and Autotote's scores were downgraded.
As to AWI, Merin found that it had "submitted a good proposal." However, as to the visibility of its customer display, Merin found that, based on the testimony and documentation, AWI had not clearly provided for a visual display unit visible from fifteen feet in its initial bid. Nevertheless, he concluded that AWI "did clarify that it would provide such a unit to fulfill its commitment to meet all RFP requirements." Merin "rejected" the Committee's view that AWI's bid did not include the fifteen-foot display demonstrated at its presentation. "[T]he clarification offered by AWI [in its November 15 letter] was indeed a clarification and not a supplement." In any case, Merin also adopted AWI's alternative reasoning that, even if the fifteen-foot display was not included, AWI's one-line personal display unit did not materially deviate from the RFP.
Merin found Autotote's proposal "deficient" as to the required hot backup system because it did not explicitly provide for such a backup. He noted that Autotote's witnesses during the hearing gave different explanations as to the configuration of the hot backup. Merin found that Autotote's proposal was also "deficient" in regard to the required seventy-two hour disaster recovery plan. He stated that even though Autotote had proposed such a plan, that proposal was inadequate because it was lacking in information.
*587 Finally, Merin disagreed with Autotote's argument that the State had a duty to seek information and allow it to amplify its bid; the RFP expressly stated that proposals could not be supplemented, changed or corrected, and that bidders had to comply with all of the requirements. Consequently, he concluded that there was an adequate basis in the record to sustain the award to AWI.
Exceptions to the recommendation were filed with the Treasurer. On November 22, 1994, the Treasurer issued a final decision awarding the contract to AWI, simultaneously denying a request for a stay of his decision. In his written decision, the Treasurer initially reviewed the legal standard by which he would award the contract. Pursuant to N.J.S.A. 52:34-12(f), he determined that a three-part test was required: "(1) Is each bidder responsible? (2) Does each bid conform to the invitation for bids (in this case the RFP)? (3) Which of the conforming bids from responsible bidders is most advantageous to the State, price and other factors considered?"
First, the Treasurer concluded that all three bidders were responsible based on the Attorney General's background checks. Second, the Treasurer discussed conformity of the bids to the RFP. As to GTECH, the Treasurer found, without elaboration, that its proposal was "fully responsive."
As to Autotote, he adopted "the Director's finding, sustained by the hearing officer[,] that Autotote's bid was materially unresponsive." He stated:
The Committee found Autotote's implementation plan to be so sparse and unrevealing that it could not evaluate how Autotote would carry out the big bang conversion.
....
Given this assessment by the Committee, the Director readily concluded that Autotote's bid was materially nonresponsive. The Hearing Officer focused his discussion on the Committee's two principal criticisms of the disaster-contingency aspect of implementation. First, he seconded the Committee's finding that Autotote proposed no hot backup CPU for the time during implementation when the secondary site (normally itself the backup) would be operating the on-line games. During the protest hearing, he noted, "Autotote's witnesses Lorne Weil, Jerome *588 Paul and John DeVries all provided different explanations as to what configuration the hot backup would be." Second, the Hearing Officer found that the Committee reasonably concluded that Autotote's proposal "did not provide for the presence of a backup facility that would be operational within 72 hours."
The Treasurer rejected Autotote's contention that the committee was under an obligation to clarify Autotote's proposal. He noted that it was the bidder's obligation  not the State's  to present a clear and specific proposal conforming to the RFP requirements.
As to AWI, the Treasurer agreed with the hearing officer that AWI's November 15 letter was a permissible clarification and that the display described therein was included in AWI's base price. He "accept[ed] AWI's commitment to provide the displays referenced in its November 15 letter as part of its base price." Notwithstanding his agreement with the hearing officer that AWI's bid included the fifteen-foot display due to the firm's clarifying letter, the Treasurer ultimately stated: in light of the "myriad of technical and operational requirements in the 200 page RFP ... even if AWI's proposal were construed to include only the personal display, nothing more than a nonmaterial deviation from the RFP would be involved."
Finally, the Treasurer considered whether AWI's or GTECH's bid was the most advantageous for the State. Based on his evaluation of technical merit, price, and the risks and uncertainties of changing vendors, the Treasurer found in his "business judgment that the AWI proposal [was] the most advantageous to the State, price and other factors considered," and awarded the contract to AWI.
On November 22, 1994, a single judge issued a temporary stay of the award pending appeal to this court. On November 28, 1994, GTECH and Autotote filed notices of appeal. Thereafter, appellants sought accelerated consideration and a stay of the contract award pending appellate review. At oral argument on November 29, 1994, we granted appellants' requests for a stay and an accelerated appeal. On December 13, 1994, we consolidated the two appeals.

*589 II

The question presented here is whether AWI and Autotote submitted bids which conformed to the RFP. The Treasurer concluded that AWI did and that Autotote did not. Both appellants argue that AWI's failure to include in its initial proposal a customer display unit that was visible from fifteen feet rendered its bid non-conforming, that that deviation was material and non-waiveable, and that it could not be remedied after the bids were opened. Autotote separately argues that, contrary to the Treasurer's conclusions, its bid was fully responsive to the RFP. Respondents counter that the Treasurer enjoys broad discretion in determining which proposals are responsive to the RFP and that his rulings cannot be interfered with unless they constitute a gross abuse of discretion.
Pivotal to the outcome of this case is the standard of review to be applied by us to the Treasurer's determinations as to bid conformity. No case has directly addressed this issue. Its resolution relates to the purposes which inform all bidding laws. Those purposes are to secure for the taxpayers the benefits of competition and to promote the honesty and integrity of the bidders and the system:
Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition.
[Keyes Martin & Co. v. Director, Div. of Purchase and Property, 99 N.J. 244, 256, 491 A.2d 1236 (1985) (quoting Terminal Constr. Corp. v. Atlantic City Sewerage Auth., 67 N.J. 403, 409-10, 341 A.2d 327 (1975)).]
All public contracts are not governed by the same bidding statute. N.J.S.A. 40A:11-6.1 (emphasis added) prescribes the bidding scheme for local governments:
All purchases, contracts or agreements which require public advertisement for bids shall be awarded to the lowest responsible bidder. ... [I]f the contracting agent ..., having sought such quotations determines that it should not be awarded on the basis of the lowest quotation received, the contracting agent shall file a statement of explanation of the reason or reasons therefor, which shall be placed on file with said purchase, contract or agreement.
*590 The lowest responsible bidder on a local public contract must not only be deemed responsible but must submit the lowest bid which conforms with the contract specifications. Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 313, 650 A.2d 748 (1994); Hillside Township v. Sternin, 25 N.J. 317, 324, 136 A.2d 265 (1957). Contracting authorities may not waive any material or substantial variance between the conditions under which the bids are invited and the proposal submitted. William A. Carey & Co. v. Borough of Fair Lawn, 37 N.J. Super. 159, 165, 117 A.2d 140 (App.Div. 1955). The reason for this is obvious:
The conditions and specifications must apply equally to all prospective bidders. Otherwise, there is no common standard of competition. Every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders. So it follows that all bids must comply with the terms imposed, and any material departure therefrom invalidates a nonconforming bid as well as any contract based upon it. If this were not the rule, the mandate for equality among bidders would be illusory and the advantages of competition would be lost.
[Sternin, supra, 25 N.J. at 323, 136 A.2d 265.]
The determination of who is the lowest responsible bidder "does not rest in the exercise of arbitrary and unlimited discretion, but upon a bona fide judgment, based upon facts tending to support the determination." 10 McQuillen, Municipal Corporations, § 29.73, at 425-26 (3 ed. 1966). The standard of review on the matter of whether a bid on a local public contract conforms to specifications (which is a component of the ultimate issue of who is the lowest responsible bidder) is whether the decision was arbitrary, unreasonable or capricious. Palamar Constr. v. Township of Pennsauken, 196 N.J. Super. 241, 250, 482 A.2d 174 (App.Div. 1983); Stano v. Soldo Constr. Co., 187 N.J. Super. 524, 534, 455 A.2d 541 (App.Div. 1983). Once the lowest responsible bidder on a local public contract is identified, the bid must be awarded to that entity.[2]
*591 On the contrary, awards of contracts paid with state funds, unless specifically addressed in other statutes, are governed by N.J.S.A. 52:34-12(f) (formerly N.J.S.A. 52:34-12(d)) (emphasis added) which provides that, when the State opens a contract to public advertisement for bids:

award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do.
The first two prongs of this statute are identical to those in the local public contracts law; required are a responsible bidder and a bid which conforms to the RFP specifications. The fundamental difference between the local and state schemes is that, upon determining the existence of a group of bidders, each of which is responsible and each of whose bids conforms to the RFP, the local authority is compelled to award the contract to the lowest bidder. The State Treasurer has discretion to determine whose bid, considering price and "other factors," will be "most advantageous to the state."
In Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 548, 222 A.2d 4 (1966), the Supreme Court stated that the statutory standard for award in N.J.S.A. 52:34-12(f) reflects a clear legislative purpose to grant the State Treasurer broad discretion. This discretion is contrapuntal to the mandatory award to the lowest responsible bidder required in a local public contracts case. As we stated in In re Honeywell Information Sys., Inc., 145 N.J. Super. 187, 200, 367 A.2d 432 (App.Div. 1976), certif. denied, 73 N.J. 53, 372 A.2d 318 (1977) (emphasis added):
[T]he [Treasurer] is given great flexibility in awarding a contract to the bidder whose proposal will be most advantageous to the State, taking into consideration all factors. In making his decision the [Treasurer] necessarily is required to exercise the sound business judgment of an executive based on all available data, expertise and advice which he may be able to garner from all available sources.
*592 See also Burroughs Corp. v. Division of Purchase and Property, 184 N.J. Super. 416, 421, 446 A.2d 533 (App.Div. 1981); Motorola Communications & Electronics, Inc. v. O'Connor, 115 N.J. Super. 317, 321, 279 A.2d 855 (App.Div. 1971).
Commercial Cleaning also established that the grant of broad latitude and discretion to the Treasurer under the state bidding laws necessarily serves to limit the scope of judicial review when a decision of the Treasurer (or Director) is challenged on appeal:
In our view the judicial standard for appraising the propriety of the exercise of.... discretion in awarding a contract or in rejecting a bid or a bidder should be that the Court will not interfere in the absence of bad faith, corruption, fraud or gross abuse of discretion.[3]
[47 N.J. at 549, 222 A.2d 4.]
See also, Keyes Martin, supra, 99 N.J. at 253, 491 A.2d 1236; Blondell Vending v. State, 169 N.J. Super. 1, 11, 403 A.2d 970 (App.Div.), certif. denied, 81 N.J. 333, 407 A.2d 1207 (1979); Honeywell, supra, 145 N.J. Super. at 200, 367 A.2d 432.
AWI and the State urge that the gross abuse of discretion standard of Commercial Cleaning applies to the Treasurer's decision on bid conformity. We disagree. The Commercial Cleaning language needs to be read in context. That case and its progeny each involved a challenge to the actual award of a contract as between responsible bidders whose bids conformed to the invitation. None of the cases involved a bid conformity determination. In applying the gross abuse of discretion standard to "awarding a contract or [in] rejecting the bid," Commercial Cleaning was referring to the action of the Treasurer in awarding the bid to one bidder and not awarding it to others under the third prong of N.J.S.A. 52:34-12(f). See also Burroughs, supra, 184 N.J. Super. at 421-22, 446 A.2d 533 (finding that the Treasurer's bid conformity decision was neither arbitrary, capricious nor unreasonable.)
This is the only reading of Commercial Cleaning which makes sense in light of the fact that bidder responsibility and bid *593 conformity are what guarantee that the goals underlying public bidding will be met. Through them the contracting unit is assured of equality among bidders, of the financial and ethical ability of the bidders to perform, and of performance of the contract in accordance with the RFP. No more deferential standard of review should be applied to these statutory mandates simply because a state contract is involved. State procurement is no less susceptible than local procurement to risks of favoritism, extravagance, improvidence or corruption. Indeed, strict rules as to bid conformity are critically important on the state level because of the broad discretion available to the Treasurer in actually awarding the contract.
In sum, the gross abuse of discretion standard referred to in Commercial Cleaning is only applicable to the single factor which distinguishes contract awards on the local and state levels: the Treasurer's ultimate business decision to exercise his discretion as between responsible bidders whose bids conform to the invitation, based on his determination as to which bid "will be most advantageous to the state, price and other factors considered."
It follows that the Treasurer's decisions as to responsibility of the bidder and bid conformity are to be tested by the ordinary standards governing administrative action:
Courts have only a limited role to play in reviewing the actions of other branches of government. In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited. Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983). Courts can intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy. Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. Campbell v. Department of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963); In re Larsen, 17 N.J. Super. 564, 570, 86 A.2d 430 (App.Div. 1952).
[George Harms Constr. Co. v. Turnpike Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
*594 In this case, because no constitutional issue is involved, our review of the Treasurer's decision as to bid conformity is confined to the other three Harms inquiries which boil down to proper factfinding and a conclusion which harmonizes with legislative policies.
Our courts have often been presented with the task of determining whether a contracting agency's decision as to bid conformity is congruent with the legislative policies underlying our public bidding laws. The preliminary inquiry is whether the bid deviates from the RFP. If there is no deviation, the bid must be deemed conforming. If there is a deviation, a decision must be made as to whether it is material and can be waived. The distinction between conditions which may and may not be waived (immaterial versus material deviations) was set forth in Terminal Construction:
[T]here are certain requirements often incorporated in bidding specifications which by their nature may be relinquished without there being any possible frustration of the policies underlying competitive bidding. In sharp contrast, advertised conditions whose waiver is capable of becoming a vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons, are the kind of conditions [which] may not under any circumstances be waived.
[67 N.J. at 412, 341 A.2d 327.]
In Meadowbrook Carting, the Supreme Court adopted the test which Township of River Vale v. Longo Constr. Co., 127 N.J. Super. 207, 316 A.2d 737 (Law Div. 1974) enunciated as the standard for resolving a materiality issue in a local contract case. Meadowbrook Carting, supra, 138 N.J. at 315, 650 A.2d 748. In River Vale, Judge Pressler declared that after identifying the existence of a deviation, the issue is "whether a specific non-compliance constitutes a substantial [material] and hence non-waivable irregularity." 127 N.J. Super. at 216, 316 A.2d 737. The test to be applied to this issue is as follows:
[F]irst, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed *595 according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.
[River Vale, supra, 127 N.J. Super. at 216, 316 A.2d 737.]
See, e.g., Palamar, supra, 196 N.J. Super. at 241, 482 A.2d 174; L. Pucillo & Sons, Inc. v. Township of Belleville, 249 N.J. Super. 536, 592 A.2d 1218 (App.Div.), certif. denied, 127 N.J. 551, 606 A.2d 364 (1991). If the non-compliance is substantial and thus non-waivable, the inquiry is over because the bid is non-conforming and a non-conforming bid is no bid at all. River Vale, supra, 127 N.J. Super. at 222, 316 A.2d 737. If, on the other hand, the non-compliance is not material and may be waived, the next step is the specific decision to grant or deny waiver which is then subject to review under the ordinary abuse of discretion standard. Ibid.
The State contends that Meadowbrook Carting plays no role in the Treasurer's bid conformity analysis because that case arose in the context of the Local Public Contracts Law. Again, we disagree. The Meadowbrook Carting analysis is applicable to both state and local contract cases because the principles which underlie all public bidding schemes are fundamentally the same:
The statutory goal guiding the Director's decision [under N.J.S.A. 52:34-12(f)] is to select the responsible bidder whose bid will be most advantageous to the State. This is an affirmation of the judicial pronouncements in this State that bidding statutes are intended to secure competition and "guard against favoritism, improvidence, extravagance and corruption," in order to benefit the taxpayers and not the bidders. See Trap Rock Industries, Inc. v. Kohl, 59 N.J. 471, 481-482 [284 A.2d 161] (1971), cert. den. 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Sternin, 25 N.J. at 322 [136 A.2d 265]; Weinacht v. Bergen Cty. Bd. of Chosen Freeholders, 3 N.J. 330, 333 [70 A.2d 69] (1949).
[Honeywell, supra, 145 N.J. Super. at 200-01, 367 A.2d 432.]
See, e.g., Keyes Martin, supra, 99 N.J. at 256, 491 A.2d 1236 (relying on Terminal Construction and noting that "[a] major objective of all public bidding statutes has been to promote the honesty and integrity of those bidding and of the system itself"); Burroughs, supra, 184 N.J. Super. at 422, 446 A.2d 533 (citing Terminal Construction); Commercial Cleaning, supra, 47 N.J. at 552, 222 A.2d 4 ("The legislative intention disclosed by N.J.S.A. *596 52:34-12 is to protect the public interest in the awarding of contracts ... [and] to promote free and lively competition among bidders...."); Donald S. Hubsch, Co. v. Sullivan, 47 N.J. 556, 560, 222 A.2d 12 (1966) (stressing in a state procurement case, the concern that "the mandate for unquestionable equality among bidders might become illusory and the advantages of competition would be lost to the public").
We recognize that Meadowbrook Carting was decided after the Treasurer's award of this Lottery contract and thus we would not expect direct reference to it in his decision. However, nothing in Meadowbrook Carting broke new ground. The two-part Meadowbrook Carting test was first set forth in River Vale twenty years ago and the individual parts of the test have been utilized by courts as early as the beginning of this century to determine materiality. E.g., Sternin, supra 25 N.J. at 325, 136 A.2d 265; Tufano v. Borough of Cliffside Park, 110 N.J.L. 370, 629-30, 165 A. 628 (1933); Case v. Inhabitants of Trenton, 76 N.J.L. 696, 699, 74 A. 672 (1909). In essence, the Meadowbrook Carting test is nothing more than an enunciation of what has always been the only relevant matter in a bid conformity inquiry: whether waiver of the deviation would thwart the aims of the public bidding laws.

III
Applying these principles, we turn first to AWI. In reaching his conclusion that AWI's bid was conforming, the Treasurer first found that the November 15 letter was a permissible "clarification" which included a screen visible from fifteen feet. Thus, he held that no deviation existed. Alternatively, he found that even if AWI's initial proposal was construed to include only the personal display, nothing more than a non-material deviation from the RFP would be involved. We conclude that the November 15 letter was not a clarification but an impermissible modification of a materially deficient bid.
We address the clarification issue first. The RFP specifically approved of bidders' clarifying or elaborating on their proposals in *597 post-opening proceedings but prohibited supplementation, change or correction. In clarifying or elaborating on a proposal, a bidder explains or amplifies what is already there. In supplementing, changing or correcting a proposal, the bidder alters what is there. It is the alteration of the original proposal which was interdicted by the RFP.
In ruling as he did, the Treasurer adopted the approach of the hearing officer who opined that AWI's proposal did not "clearly" provide for a fifteen-foot visual display. It was this oblique finding of ambiguity which laid the groundwork for the ultimate conclusion that the November 15 letter was a "clarification" and that the bid was conforming. The record does not support this conclusion.
Although the RFP allowed the bidder to propose a customer display unit which was mounted on the terminal, a pole, a window or wall or in some other location, that flexibility did not extend to visibility. The RFP specified that messages on the customer display unit "must be clearly visible from fifteen feet by customers." AWI proposed its basic Ovation terminal as its customer display. It concedes that the messages on this display are not visible from fifteen feet but can only be seen by the customers "at or nearby the counter." AWI stated that the Ovation could send messages to any customer display attached to the basic unit and that the Ovation could support a multiple monitor display of up to 12 monitors. In the section AWI's proposal entitled "Additional Terminal Features and Characteristics Included in Base Rate," no mention was made of a customer display visible from fifteen feet. The section which addressed "Additional Terminal Features Not Included in Base Rate" referred to the "four-color light-emitting diode (LED) display, visible for up to 100 feet" available at additional cost. (5200 units at $1250 each). AWI's proposal did not include a customer display visible from fifteen feet.
After the bids were opened, AWI showed three displays at an evaluation demonstration. Two of these, the personal display and the one hundred-foot display, were each clearly referenced in the *598 original bid documents. In addition, a fifteen-foot display, never previously referred to, was shown. In response to the evaluator's question as to what was included in the base price, AWI responded on November 15:
A larger counter-top customer display capable of being remotely programmed, displaying promotion messages, and readable at a minimum distance of 15 feet is also supported by the terminal. AWI will provide these displays and fulfill the RFP requirement, as stated in our RFP response 6.3.1 that the Ovation terminal meets all requirements.
In its report, the Evaluation Committee found that, unlike both GTECH's and Autotote's proposals, AWI's proposal did not meet the requirements of the RFP as to fifteen-foot visibility, the importance of which the committee underscored as contributing "greatly to sales and marketing programs." Despite AWI's agreement in its November 15, 1993 letter to provide the larger counter-top customer display, the Committee did not consider that display as part of AWI's original proposal.
The Director never addressed the issue of visibility. Interestingly, in rejecting the Committee's view and ruling that the November 15 letter was a "clarification," neither the hearing officer nor the Treasurer found that AWI's original proposal contained a display visible at fifteen feet. Both found the clarification to be AWI's post-opening "commitment" to supply such a unit as part of its base price.
A post-opening commitment to supply an essential missing from a bid is not a clarification. It is an impermissible supplementation, change or correction within the meaning of the RFP and it flies in the face of our public bidding scheme.
AWI argues that the fifteen-foot customer display was referred to in the section of its bid which stated that "up to twelve monitors can be connected to the Masterlink system through the Ovation Terminal." It is also argued that because AWI's description of the Ovation Terminal referred to a variety of customer display "options," the fifteen-foot display must have been included. Not so. It was included only to the extent that every display monitor in the universe was included in the prior references. Neither *599 explicit nor even vague reference to a specific display visible at fifteen feet can be wrung out of any provision of AWI's proposal. Indeed, the suggestion that the fifteen-foot display was somehow present in the bid is particularly difficult to credit in light of the way in which AWI painstakingly detailed all other aspects of the proposal. It is inconceivable that a proposal which described the function of each of the twenty-nine keys on the Ovation terminal in an individually numbered paragraph was meant also to include 5,200 fifteen-foot monitors without ever mentioning them.
AWI also argues that its general promise to meet all RFP and terminal requirements created the ambiguity which justified clarification. The Treasurer properly did not rely on these provisions to support the notion of clarification. Presumably he recognized that such a position would render meaningless the requirement of bid conformity. If AWI's view were to be accepted, it would pave the way for a two-line proposal including only a promise and a price. It would likewise render any bid, no matter how superficial, subject to post-opening "clarification," thus laying the groundwork for the shenanigans which the bidding statutes were enacted to avoid. Nothing about this RFP suggests that this was what was intended.
This is not a situation in which AWI's customer display was plainly included in its original bid without its fifteen-foot visibility function fully described. That scenario would allow clarification. Here, it is conceded that the included display had no such function. Allowing AWI to respond to a significant RFP requirement after it knew what other bidders had proposed and after it knew how its price and product stacked up against the other offerings is exactly what our bidding laws were intended to prevent. It follows that AWI's original bid deviated from the RFP and that the so-called clarification was impermissible.
The Treasurer alternatively opined that "even if AWI's proposal was construed to include only the personal display [not visible from fifteen feet], nothing more than a nonmaterial deviation from the RFP [was] involved." Although not expressly *600 stated, the point of this holding was that if it was an immaterial deviation, the Treasurer was free to waive the requirement of a fifteen-foot display altogether or to accept it belatedly because only material elements of a bid cannot be supplied after the bids are opened. River Vale, supra, 127 N.J. Super. at 222, 316 A.2d 737.
In reaching his conclusion, the Treasurer failed to address the relevant standards. His first inquiry should have been whether waiver of a screen visible at fifteen feet would deprive the state of assurance that the contract will be "entered into, performed and guaranteed according to its specified requirements." Obviously, a literal answer to that question would be no. However, the test seems to be more flexible than that and allows the Treasurer to evaluate the entire RFP and determine the overall importance of the omission to it as a whole. We think that the Treasurer was trying to perform this function when he concluded that the lack of a customer display visible at fifteen feet was an immaterial deviation vis a vis "the myriad of technical operational requirements in the 200 page RFP." This conclusion is of dubious validity in light of the importance all evaluators placed on the advertising function of the Lottery and considering the explicit language of the RFP as to the visibility factor. As we have recently observed, "the success of the State Lottery, an important source of public revenue, depends upon the effectiveness of its advertising." Keyes Martin & Co. v. Director, Div. of Purchase and Property, 196 N.J. Super. 52, 68, 481 A.2d 572 (App.Div. 1984) (Brody, J., dissenting), reversed on other grounds, 99 N.J. 244, 491 A.2d 1236 (1985).
We need not grapple with this issue, however, because it is clear that the Treasurer's determination is invalid because it failed to address the second prong of Meadowbrook Carting: whether a waiver of the fifteen-foot display requirement would affect the integrity of the public bidding scheme. Meadowbrook Carting, supra, 138 N.J. at 315, 650 A.2d 748. That is what a materiality *601 inquiry entails, even where the bidder has committed, after the fact, to provide the omitted item.
Ordinarily we would remand a matter like this to the administrative agency for an expression of the factual and legal conclusions supporting its decision under the proper standard. However, there is no reason to do so because it is clear that this 3200 page record, which we have reviewed, will not support the conclusion that a waiver could be granted without impairing the integrity of our public bidding scheme.
AWI argues that this conclusion is incorrect because it did not receive an advantage in that it will still have to pay for and provide the fifteen-foot displays. This contention too narrowly construes the concept of "integrity" in public bidding. AWI's after-the-fact underwriting of the cost of the 5200 missing displays does not mean that the position of other bidders and potential bidders was not undermined by these proceedings. Only two million dollars separated GTECH from AWI on a contract valued at over 100 million dollars. If GTECH and Autotote had known that the 5200 fifteen-foot displays could be omitted from their bids without disqualification, their bids would likely have been lower. Likewise, if a price for the omitted units had been included in AWI's bid, its bid would have been higher. These variations could have been extremely important. For example, if AWI's cost for a unit visible from fifteen feet was $385 ($2,000,000 ÷ 5200), as between the two, GTECH would have been the lowest bidder. If it cost exactly $385, the bids of AWI and GTECH would have been veritably identical. Keeping in mind that GTECH's proposal was rated far superior to AWI's in every category at every level, even if the units cost less than $385 each, the outcome might have been affected by the closing of a portion of the price gap.[4] Moreover, the omission of a cost item can be material even if it is unlikely *602 that it could have affected the relative positions of the bidders, because it necessarily undermines the common standard of competition. Further, the requirement of a screen visible at fifteen feet might have deterred other bidders from bidding. These are factors which our cases have consistently referenced as undermining the fairness of our bidding scheme. Pucillo, supra, 249 N.J. Super. at 547, 592 A.2d 1218; Meadowbrook Carting, supra, 138 N.J. at 323, 650 A.2d 748.
At oral argument, AWI and the State also urged that because the RFP requires the missing displays to be provided if the contract is awarded, any deviation in the proposal is necessarily immaterial. Not so. Their reliance on two provisions of the RFP (§§ 3.18 and 7.3) and an administrative regulation of the Division of Purchase and Property to support this claim is misplaced. RFP § 3.18, which authorizes the Director to waive a non-material deviation in a proposal, provides that such waiver shall not excuse the bidder from full compliance with the contract requirements upon award. N.J.A.C. 17:12-2.4 likewise authorizes the Director to waive "minor informalities" in the bid and, if necessary, to make a "stipulated award to a bidder" so long as the stipulated award is not "used to correct a deficient bid proposal." Plainly, the RFP and the regulation contemplate that if the bidder's proposal deviates from the RFP in a material way, no award  stipulated or otherwise  may take place. These provisions require a particular sequence of events.
First, a determination as to materiality must be made. If a deviation is deemed material, a post-opening proffer by a bidder would necessarily be an interdicted modification. Only after a deviation is determined to be non-material can a contract be awarded. In that event, the bidder may be required to supply what was called for in the RFP. This is a far cry from the suggestion that a bid is automatically conforming because the RFP requirements will have to be supplied in any event. If this were the case, it would not matter what a bid contained and the requirement of a non-material deviation in the RFP, the rule and *603 the cases would be utterly meaningless. In short, evidence of what might be required of a bidder after an award, or what might be offered by a bidder after bid opening, may not be considered in a materiality inquiry. Any other view would turn the bidding scheme on its head. RFP § 7.3 has no relevance whatsoever to this argument. It merely provides that hardware and software as proposed by the bidder must be included in the final delivered system.
AWI contends that to the extent that the main purpose of competitive bidding is to benefit the public, it has been met in this case because the public has received the benefit of its lower bid along with its belated commitment to provide the missing items. The problem with this analysis is that it omits consideration of the fact that the integrity of the bidding process is more important than any isolated savings the State may obtain through an irregular proceeding. Meadowbrook Carting, supra, 138 N.J. at 324, 650 A.2d 748. It also begs the question to the extent that we cannot know how low the bids would have gone if GTECH and Autotote had also omitted the 5200 fifteen-foot units from their price.
It is unclear how it came to pass that AWI's initial bid was defective. Perhaps it was an error. On the other hand, it may be that AWI chose to bid with its basic Ovation model to depress its bid price and, at the same time, entice the State into purchasing a pricey 100 foot display option as an enhancement to the Lottery advertising function. Either way, it was not until it could assess its relative position after bid opening that the third customer display was thrown in. This is one of the evils our public bidding laws were intended to avoid.
In sum, an immateriality finding was impossible on this record. Because the bid of AWI deviated in a material way from the RFP, it was non-conforming and the Treasurer was without discretion to award the contact to AWI. L. Pucillo & Sons, Inc. v. Mayor and Council of Borough of New Milford, 73 N.J. 349, 357, 375 A.2d 602 (1977); Sternin, supra, 25 N.J. at 324, 136 A.2d 265. *604 This ruling makes it unnecessary for us to address appellants' alternative challenges to AWI's bid.

IV
We turn next to the Treasurer's rejection of Autotote's bid. Here, the State determined that a remote hot backup site would be an essential element of the Lottery contract to provide assurance that the Lottery could continue to operate, without interruption, in the event of the catastrophic failure of any aspect of the system.
Pursuant to the RFP, a hot backup system and a seventy-two hour disaster recovery plan had to be proposed by the bidder for the months during implementation and conversion. Although the bidder could propose an alternative plan from that specified in the RFP, the bidder had to "meet or exceed all the requirements specified in the RFP." The contractor was advised that "[t]he plan must detail hardware production capability, software development, and installation and testing of hardware and software components." The RFP required that the implementation plan include a time chart identifying the major milestones to be accomplished for the construction, delivery, installation and implementation of the proposed system.
The Autotote implementation plan consisted of five pages of description and seven and one-half pages of milestone charts. In response to the RFP requirement that the proposal include an implementation plan with the details of the installation and testing of the hardware and software components, Autotote stated: "Autotote acknowledges its understanding and compliance with the § 8.2 Lottery installation and testing requirements." Absent from Autotote's proposal was an indication that it would configure the secondary site with more than one central system at any time during the six-month conversion phase. The sole reference in Autotote's implementation plan to the secondary site, which would operate as the primary site for the first six months, was as follows:

*605 Consistent with the requirements of the RFP, Autotote Lottery Corporation will provide for the availability of the Secondary site facilities, computer hardware, communications hardware, software, and at least (10) locally-connected test terminals installed and operational by August 15, 1994.
While Autotote did include an outline of a disaster recovery and contingency plan, there was no indication that it would be in effect during implementation.
The Treasurer found that Autotote's plan was inadequately detailed and lacked reference to a hot backup and disaster plan which would take effect during implementation. He thus concluded that Autotote's bid was materially non-responsive. We are satisfied that the Treasurer fully analyzed this issue and that his ultimate conclusion that Autotote's bid was non-conforming in a material way was supported by substantial evidence in the record as a whole and accorded with the legislative policies underlying our public bidding laws.
Autotote's proposal was silent on the details of the critical RFP requirements of a hot backup during implementation and a disaster recovery plan for the secondary site. In essence, Autotote omitted elements of the fundamental plan under which it intended to operate the Lottery. As late as the hearing, at which the focus was on the omissions in its bid, Autotote's representatives were still unable to agree as to the exact method by which it intended to carry out its obligations. Even in its brief on this appeal, Autotote relies on "industry practice," generalities in its proposal, and "deductive reasoning" to fill in the interstices in its bid.
This is the evil which the prohibition against waiver of material conditions was meant to address. At the heart of these RFP plan requirements is the duty of each bidder to convince the Treasurer that it understands the needs of the Lottery and has the expertise and a fully conceived methodology to implement the new on-line system. Even with Autotote's representation that it would live up to the Lottery's implementation and testing requirements, without more detail the Treasurer could never know exactly what the State would be getting from Autotote and thus could not be assured "that the contract will be entered into, performed and *606 guaranteed according to its specified requirements." Meadowbrook Carting, supra, 138 N.J. at 315, 650 A.2d 748; River Vale, supra, 127 N.J. Super. at 216, 316 A.2d 737.
There is merit to Autotote's argument that if it had been treated as generously as AWI in the evaluation process and been asked direct questions about the deficiencies in its bids, it might have been able to establish its bid as conforming. However, this inequity can not enhance Autotote's position at this stage, in light of our ultimate conclusion that AWI was treated too generously.
Because the Treasurer was not presented with any deficiencies as to the hot backup capabilities or the disaster recovery plans of either AWI or GTECH, we do not here address that part of Autotote's argument. Accordingly, we affirm the Treasurer's determination that Autotote's bid was non-conforming.

V
What remains is to determine the next step in the awarding of this Lottery contract. N.J.S.A. 52:34-12(f) expressly grants the Treasurer (or the Director of the Division of Purchase and Property) the discretion to determine which proposal "will be most advantageous to the State, price and other factors considered." That statute also allows him to reject any or all of the bids when "the public interest" demands it. As we have said, in making his decision, the Treasurer "necessarily is required to exercise the sound business judgment of an executive based on all available data, expertise and advice which he may be able to garner from all available sources." Honeywell, supra, 145 N.J. Super. at 200, 367 A.2d 432. Accordingly, we remand the matter to him to assess the GTECH bid and to determine whether to award the contract to GTECH or to rebid the contract.
Affirmed in part; reversed in part; the matter is remanded to the Treasurer for further proceedings in accordance with the principles to which we have adverted.
NOTES
[1] Autotote's bid stated: "Messages displayed by the LED are clearly visible by customers from more than fifteen (15) feet." GTECH's bid stated: "Starlet messages are clearly visible from fifteen feet."
[2] The only exception is the case in which a decision is made to reject all bids. E.g., George Harms Constr. Co., 161 N.J. Super. 367, 391 A.2d 960 (Law Div. 1978); Cardell Inc. v. Township of Woodbridge, 115 N.J. Super. 442, 280 A.2d 203 (App.Div. 1971);
[3] Because there is no allegation of bad faith, corruption or fraud in this case, gross abuse is the only applicable Commercial Cleaning standard.
[4] Despite several days of hearings, no evidence was offered by AWI as to the value of the fifteen-foot displays, nor would AWI suggest such a value at oral argument on this appeal.