697 A.2d 131

IN RE DBC PROJECT # A0716–00.

Superior Court of New Jersey
Appellate Division

Argued May 14, 1997—Decided May 30, 1997.

Before Judges LONG, A.A. RODRÍGUEZ and CUFF.

*Benjamin Clarke* argued the cause for appellant (*DeCotiis, Fitzpatrick & Gluck,* attorneys).

*Jeanne Victor,* Deputy Attorney General, argued the cause for respondent Department of Building and Construction (*Peter Verniero,* Attorney General, attorney).

*Robert Lawless* argued the cause for respondent *Fitzpatrick & Associates, Inc.* (*Hedinger & Lawless,* attorneys; *Robert Hedinger* and *Anthony J. Belkowski,* on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

On October 28, 1996, the New Jersey Division of Building and Construction (DBC) solicited bids for the renovation of the Department of State Building located at 225 West State Street in Trenton. (DBC Project No. A–0716–00). In response, Paphian Enterprises, Inc. submitted the lowest bid, offering to perform the general construction work for a total contract price of $6,399,723.[1] The second lowest bid was submitted by Fitzpatrick & Associates for a total contract price of $6,495,000. With certain alternatives, Paphian's total price would increase to $6,425,322 and Fitzpatrick's would increase to $6,639,000, leaving Paphian the lowest bidder by a margin of approximately $214,000.

The DBC regulation governing submission of bids, N.J.A.C. 17:19–2.12(c), provides that each contractor shall include with its bid "a statement of the current value and status of its uncompleted work, and whether the award of the given contract would exceed its aggregate rating limit." Paphian and Fitzpatrick each submitted with its bid a certification that the amount of its bid proposal, including all outstanding incomplete contracts, did not exceed its aggregate rating limit. Neither submitted with its bid a statement of the current value and status of its uncompleted work. Despite the express terms of N.J.A.C. 17:19–2.12(c), according to DBC, its normal practice is not to require the statement. Instead, DBC normally relies solely on the certification, which does not require the bidder to state the amount of uncompleted contracts.

By mistake, Paphian also included with its bid proposal an executed Form 701, which is required only when submitting bids for Department of Education work. On the form, Paphian listed the amount of its uncompleted work as "–0–". While Form 701 seeks information as to all outstanding work from any source, Paphian incorrectly believed it requested only the value of uncompleted contracts currently under performance for the Department

---

[1] The quoted price was to be good for 60 days after the bid opening date.

of Education. Although DBC did not require submission of Form 701 for the bid at issue here, Paphian's unusual response indicating no contract backlog naturally triggered an inquiry from Richard Ferrara, DBC's Chief of Contracts and Procurement. After the bid opening on December 17, 1997, Paphian explained its error. Instead of simply disregarding the unsolicited form, DBC requested that Paphian provide a revised Form 701 as well as a breakdown of all uncompleted work on all contracts. No other bidder, including Fitzpatrick, was required to provide a Form 701 post-bid. Instead, DBC accepted Fitzpatrick's certification that the amount of its bid proposal, including all outstanding incomplete contracts, did not exceed Fitzpatrick's $29,000,000 aggregate rating limit.

On December 19, 1996, Paphian provided DBC with a revised Form 701, which reflected that the total amount of uncompleted work on five named projects was $3,139,245. Paphian also included a statement which included the names, the full contract amounts and the uncompleted portions of those five open projects. To calculate the value of uncompleted work, Paphian's President, Savas Tsivicos, used Paphian's cost to complete the contracts, which is consistent with the method used by surety companies for bonding purposes. At the time of the bid proposal, Paphian's aggregate rating limit was $10,000,000. Therefore, based on Paphian's calculation, as of the time of the bid opening, the total bid price with all alternates ($6,425,322), when added to the value of uncompleted contracts ($3,139,245), did not exceed this $10,000,000 limit ($9,564,567).

On December 20, 1996, DBC's Chief of Procurement and Contracts, having deemed Paphian "responsible," recommended to DBC that the contract be awarded to Paphian. Paphian subsequently reconfirmed its bid price, which is the normal DBC practice. DBC's recommendation to award the bid to Paphian was not communicated to the public or to the other bidders.

DBC then proceeded with a due diligence inquiry, which revealed no problems with Paphian's prior performance on other

projects. Paphian promptly responded to all requests for additional information. Twice in February, 1997, Paphian agreed to extend its bid price upon DBC's request, with the understanding that litigation over the award of an electrical contract was causing delays in awarding the contract.

Without Paphian's knowledge, Fitzpatrick, armed with the Form 701 information which Paphian had been required to file, began an independent investigation of Paphian's uncompleted contracts in February, 1997. Because those jobs were public, Fitzpatrick was able to obtain information concerning the outstanding contract balances on them. On February 27, 1997, Fitzpatrick filed a formal protest against the bid of Paphian based, in part, on its conclusion that the actual amount of Paphian's uncompleted contracts was at least $4,259,069, as opposed to the $3,139,245 figure provided by Paphian. This put Paphian in excess of its aggregate rating limit as of the date of the bid opening. Fitzpatrick accordingly demanded that Paphian's bid be rejected.

On February 28, 1997, DBC notified Paphian of Fitzpatrick's bid protest. On March 3, 1997, Paphian objected to the protest as out of time. Thereafter, in response to DBC's request, Fitzpatrick supplemented its protest with copies of contract requisitions for two additional uncompleted public jobs and calculated that Paphian exceeded its aggregate rating on the bid date by $847,037 due to an understatement of uncompleted contracts by at least $1,315,-069.

The sole difference between Paphian's figures and those of Fitzpatrick was due to calculation methodology. Paphian's calculation was based upon its cost to complete the outstanding jobs and Fitzpatrick's on the outstanding contract balances.

On March 5, 1997, without further independent inquiry, DBC advised Paphian, based on DBC's evaluation of the documentation submitted by Fitzpatrick, that Paphian's uncompleted contracts, in combination with its bid price, exceeded its aggregate rating limit. In reaching this conclusion, DBC relied on the outstanding con-

tract balance method of calculation. DBC thus rejected Paphian's bid as "non-responsible." On March 7, 1997, Paphian made a timely request for a hearing. On March 11, 1997, Paphian's DBC aggregate rating limit was increased to $15,000,000. On March 18, 1997,[2] an informal hearing was held before the Director of the DBC. The hearing focused on three basic issues: the timeliness of Fitzpatrick's bid protest; the correct method for calculating uncompleted work; and whether Paphian should be allowed to meet the alternate responsibility standard of *N.J.A.C.* 17:19–2.12(c)1.

As to timeliness, Paphian argued that Fitzpatrick's protest was at least 67 days overdue under N.J.A.C. 17:19–4.3(a) which provides:

> Any participating bidder seeking a hearing shall make written request to the Director setting forth the specific grounds for challenging the award. The request must be received by DBC within five calendar days after the opening of bids.

Paphian further urged that it would be inequitable to reject its bid based on an untimely protest where the information for the protest came from its own mistaken filing of Form 701. Fitzpatrick countered that, by its very terms, *N.J.A.C.* 17:19–4.3(a) allows a bidder to challenge an "award" and that its protest was timely because it preceded the formalization of the award in this case.

As to the method for calculating outstanding work, Paphian submitted the certification of its President, Savas Tsivicos, who related the circumstances surrounding its bid, including its position that the use of the cost-to-complete method for calculating outstanding work fully conformed with standards and practices in the industry. In addition, Paphian submitted the affidavit of Bruce Allen, a representative of its surety, Safeco.

Allen stated, based on 23 years experience in the bonding industry, that the standard for calculating work on hand is "well-established and relatively uniform within the surety industry."

---

[2] As of the hearing date, all bids had been extended through April 10, 1997.

That standard is the contractor's cost to complete the contract, *not* the unpaid contract balance. According to Allen:

> For any contract on which work has started and advanced beyond the initial stages, work on hand is calculated by reference to the contractor's cost to complete the contract, not by unpaid contract balances.
>
> The reason for this is very simple: unpaid contract balances are an unreliable measure of the amount of actual work that remains to be completed on a contract, which is the true focus of concern. The *only* time contract balances are used to calculate work on hand is before work has begun or at the very beginning of a project. Once work has begun and progressed beyond the very early stages, a contractor seeking bonding is expected—and *required*—to provide its surety with actual work on hand figures, not simply unpaid contract balances.

Allen included in his certification an excerpt from a surety industry text supporting the position that work on hand is calculated on the basis of the contractor's cost to complete.

Paphian argued that the cost-to-complete method is superior for two reasons: (1) other method favors the front-loading contractor[3] who may show a low contract balance despite a larger balance of work remaining and (2) because the cost-to-compete methodology is based on an accounting practice within the construction industry, as are DBC's rating limits, it would be consistent to interpret the regulations in *pari materia*. Paphian also argued that there was no dispute that it acted in good faith in submitting its calculations.

Fitzpatrick countered that calculating the value of uncompleted work based on the outstanding contract balance is consistent with the regulations, which speak in terms of contract values. More particularly, Fitzpatrick relied on *N.J.A.C.* 17:19–2.12(c) which provides in relevant part that:

> A contractor shall include with each bid a statement of the current value and status of its uncompleted work, and whether the award of the given contract would exceed its aggregate rating limit. Whether a contract is eligible for a given award shall be determined based on the dollar value of the given contract, the contractor's aggregate rating limit as of the bid due date, and the dollar value of the contractor's uncompleted contract work as of the bid due date.

---

[3] Presumably this means the contractor who collects his profit and overhead up front, leaving a lower unpaid balance at the end.

Fitzpatrick urged that Paphian's use of the contract balance methodology would result in the "dollar value" of the given contract having a different meaning from the "dollar value" of uncompleted work.

Fitzpatrick also argued that a valuation based on cost-to-complete would place contractors on a different footing, depending on the percentages of profit which they build into their contracts, and that this method would be practically unworkable for public bidding purposes:

> How do you ever determine with any degree of uniformity what a bidder's incomplete work is? It would require almost a case-by-case, project-by-project analysis of his job cost report, his bid sheets, and probably a whole mess of other financial records to determine what the value of the incomplete work is if you were going to determine it on a cost-to-complete basis. I submit to you it's totally unworkable.

Ferrara of DBC acknowledged that there are no published materials available to bidders to explain the proper method of calculating uncompleted work. In this connection, it is important to note that the parties do not dispute the accuracy of the figures presented by either side; they dispute only the methodology for computing uncompleted work for purposes of determining Paphian's responsibility.

The final issue at the hearing was whether Paphian should be allowed to meet the alternate responsibility provision of *N.J.A.C.* 17:19–2.12(c)(1). Under that rule, a bidder who is unable to meet the requirements of *N.J.A.C.* 17:19–2.12(c) as of the time of bid opening may demonstrate responsibility by submitting clear and convincing evidence that it will be below its aggregate rating limit by the time the bid project is scheduled to begin. Paphian argued that, regardless of which methodology was used to calculate uncompleted contracts, it should be permitted to show that the total value of its uncompleted work as of the projected start of the job, even taking into consideration its recent acceptance of a $869,000 contract, would not exceed either its new $15,000,000 aggregate limit or the $10,000,000 limit which was applicable when

the bids were opened.[4] Fitzpatrick disagreed, contending that these calculations were irrelevant because the regulation clearly states that the submission of evidence showing the contractor's ability to meet the alternative standard must be made as of the bid opening date. Counsel for Fitzpatrick stated:

> So what I submit to you is that this whole discussion of the fact their rating has been increased since the bid opening and that their aggregate work-on-hand has gone down, while all this may be mathematically correct from a purely number standpoint, it is totally irrelevant for the decision you have to make relevant to this protest, that being at the time this bid was open did Paphian's bid, when added to its incompleted work, exceed what was then its aggregate limit, which really brings us to, I think, the million-dollar question, the million-dollar question being what was the work-on-hand at the time this bid was opened?

On April 2, 1997, the Director issued a final decision rejecting Paphian's bid as non-responsible as well as non-compliant with the bidding regulations due to Paphian's inaccurate statement that it was under its rating capacity limit at the time of bid.

With respect to the timeliness of Fitzpatrick's protest, the Director, relying on *N.J.S.A.* 52:35–7, held that challenges to bidder responsibility may be lodged at any time prior to the award of the contract.

The Director next rejected Paphian's method of valuing uncompleted work. He found the regulations on this subject to be crystal clear: "The regulations require the contractor to disclose the dollar value of uncompleted work and not an estimate of its actual cost to complete the work, without including profit and overhead." He also stated, "[F]or consistency and uniformity, the unpaid contract balance must be the measure of calculating the current value and status of a contractor's uncompleted work."

---

[4] According to Paphian, using the cost to complete methodology, its balance of uncompleted work as of 3/17/97 was $1,885,000. When added to the total bid proposal with all alternates ($6,425,322) and the value of the new contract awarded to Paphian for $869,000, Paphian would have been below its $10,000,-000 aggregate rating limit by $820,678 ($9,179,322). Utilizing the contract balance method, which would increase the value of uncompleted work to $2,495,142, Paphian would have been below its $10,000,000 aggregate rating limit by $210,536 ($9,789,464).

According to the Director, based on the correct methodology, Paphian exceeded its rating limit at the time of bid by almost $900,000.

The Director also accepted Fitzpatrick's argument that Paphian could not, based on an increased aggregate rating and lower outstanding contract balances, demonstrate its compliance with the alternative requirements for responsibility. Instead, he determined that such evidence must be submitted by the bidder *with its bid.* The Director held: "In summary, Paphian did not comply with the bidding requirements specified in the regulations because at the time of bid, it certified that it was under its bid capacity but this, in fact, was an inaccurate statement."

The Director concluded by upholding Fitzpatrick's bid protest and recommending that the general construction portion of the contract be awarded to Fitzpatrick. As of the date of the Director's April 2 decision, Fitzpatrick had not provided a breakdown of its uncompleted work to DBC; therefore, the recommendation to award the contract to Fitzpatrick was made on the basis of Fitzpatrick's certification that it was below its aggregate rating limit at the time of bid, and nothing more.

On April 4, 1997, Paphian filed a formal protest of DBC's award to Fitzpatrick based on a challenge to Fitzpatrick's responsibility. It requested a hearing before the DBC. Citing *N.J.A.C.* 17:19–2.12(c), Paphian claimed that Fitzpatrick's bid, which did not contain a statement of Fitzpatrick's current value and status of uncompleted work, was not only non-responsive but insufficient to support the DBC's finding of responsibility. Paphian argued:

> In light of the recent emphasis DBC has placed on the need to be able to verify from a bid submission that a bidder is in fact under its aggregate limit, the mandatory requirement [of *N.J.A.C.* 17:19–2.12(c)] that bidders provide a "statement of the current value and status of uncompleted work" cannot be satisfied merely by submission of a conclusory self-certification that a bidder is under its limit.

Fitzpatrick filed a response on April 7, 1997, claiming that Paphian's challenge was "grossly out of time" and without merit because Fitzpatrick's submission was "exactly what the DBC

Form of Proposal asked for." Fitzpatrick also contended that Paphian's bid was properly rejected because it contained misrepresentations concerning Paphian's outstanding work and that Fitzpatrick was well within its rights to inquire into the matter.

By letter dated April 7, 1997, the Director rejected Paphian's bid protest and denied its request for a hearing. The Director construed Paphian's protest as a challenge *not* to Fitzpatrick's responsibility, but to its "responsiveness" and advised Paphian that DBC would move forward with the award on April 10, 1997. Apparently, by fax transmission on April 7, 1997, Fitzpatrick provided a breakdown of its uncompleted work to DBC. The Director did not refer to this information in his April 7 decision, and it is impossible to tell from this record whether this information was received before DBC's decision was rendered.

Paphian filed a notice of appeal and a motion for emergent relief on April 7, 1997. Following a hearing on April 9, 1997, attended by counsel for Paphian, Fitzpatrick and DBC, we granted Paphian's motion for a stay and ordered the matter accelerated. Pending this decision, all bids have been voluntarily extended through May 30, 1997.

On appeal, Paphian argues (1) that Fitzpatrick's protest was untimely; (2) that the cost to complete methodology for calculating work on hand is not prohibited by *N.J.A.C.* 17:19–2.12(c); (3) that the Director's holding to the contrary was not only unreasonable but constituted improper rulemaking; (4) that Paphian was entitled to show that it could meet the alternate responsibility standard of *N.J.A.C.* 17:19–2.12(c)(1); and (5) that the Director was arbitrary in rejecting Paphian's bid protest against Fitzpatrick and denying it a hearing. Because we agree with the second, third and fourth of these contentions, we reverse.

*I*

The purpose of public bidding laws is "to secure for the taxpayers the benefits of competition and to promote the honesty and integrity of the bidders and the system." *In re Protest of the*

*Award of the On–Line Games Production and Operation Services Contract,* 279 *N.J.Super.* 566, 589, 653 *A.*2d 1145 (App.Div.1995). For that reason, bidding statutes are to be construed "as nearly as possible with sole reference to the public good" with their aim being "to secure for the public the benefits of unfettered competition." *Keyes Martin & Co. v. Director, Div. of Purchase,* 99 *N.J.* 244, 256, 491 *A.*2d 1236 (1985) (quoting *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 409–10, 341 *A.*2d 327 (1975)).

■ "[B]idder responsibility and bid conformity are what guarantee that the goals underlying public bidding will be met. Through them the contracting unit is assured of equality among bidders, of the financial and ethical ability of the bidders to perform and of the performance of the contract in accordance with the RFP." *In re On–Line Games, supra,* 279 *N.J.Super.* at 592–93, 653 *A.*2d 1145. Where, as here, the State has mandated an award to the lowest, responsible bidder, without vesting any discretion in the DBC to determine whose bid among responsible bidders will be the most advantageous to the State, any decision of the Director as to responsibility and bid conformity should be evaluated under the same standards governing ordinary administrative action, that is, whether it was arbitrary and capricious. *Id.* at 593, 653 *A.*2d 1145. Tested by that standard, the Director's decision here requires reversal.

## II

■ We turn first to Paphian's claim that Fitzpatrick's bid protest was out of time. In support of its contention, Paphian cites *N.J.A.C.* 17:19–4.3(a), which states:

> Any participating bidder seeking a hearing shall make written request to the Director setting forth the specific grounds for challenging the award. The request must be received by DBC within five calendar days after the opening of bids.

It is undisputed that Fitzpatrick's protest came well beyond the five day limit for requesting a hearing. Bids were opened on December 17, 1996, and Fitzpatrick's protest was lodged on Feb-

ruary 27, 1997. The DBC rejected Paphian's argument on the
basis that *N.J.S.A.* 52:35–7 allows challenges to bidder's responsi-
bility to be lodged at any time prior to the award of contract.
That statute provides:

> Nothing contained in this chapter shall be construed as depriving any state official
> of the right to reject a bidder at any time prior to the actual award of a contract,
> where there have been developments subsequent to the qualification and classifica-
> tion of such bidder, which in the opinion of the awarding official would affect the
> responsibility of the bidder.

We agree with the Director that this statute vests DBC with the
right to act at any time prior to the actual award of a contract in
connection with developments affecting a bidder's responsibility.
The issue of bidder responsibility, with its importance to the
public weal, is at the heart of the bidding process and is not
subject to the timeliness restraints in *N.J.A.C.* 17:19–4.3(a). This
brings us to the merits of the Director's ruling.

### III

In essence, the Director decided: (1) that the clear lan-
guage of *N.J.A.C.* 17:19–2.12(c) requires calculation of the value of
uncompleted contracts by the balance of payments method and not
the cost-to-complete method used by Paphian; (2) that based on
the balance of payments methodology, Paphian exceeded its rating
limit at the time of the bid, thus rendering its certification
inaccurate; and (3) that Paphian was barred from submitting
evidence of compliance with the alternate responsibility require-
ments of *N.J.A.C.* 17:19–2.12(c)(1) because that evidence had not
been submitted with its original bid. We will address these
conclusions serially.

*N.J.A.C.* 17:19–2.9 establishes the methodology for deter-
mining a contractor's aggregate rating limit. Under this regula-
tion, which is not at issue here, Paphian's limit was $10,000,000 as
of the bid opening. It was at this point that *N.J.A.C.* 17:19–2.12
came into play. That rule provides:

> (a) A contractor shall not be awarded a contract which, when added to the
> uncompleted portions of all other currently held contracts from whatever source

(public or private) sources, would exceed the contractor's aggregate rating limit. For example, for purposes of determining the dollar value of currently held contracts, contracts from the State of New Jersey, from other governmental jurisdictions and from the private sector shall be counted.

(b) Where there is a question of whether a contractor's aggregate rating limit can accommodate a given award, the contractor's bid for the contract shall be opened in the normal course, and the contractor's eligibility shall thereafter be computed.

(c) A contractor shall include with each bid a statement of the current value and status of its uncompleted work, and whether the award of the given contract would exceed its aggregate rating limit. Whether a contract is eligible for a given award shall be determined based on the dollar value of the given contract, the contractor's aggregate rating limit as of the bid due date, and the dollar value of the contractor's uncompleted contract work as of the bid due date.

1. However, where a contractor provides with its bid clear and convincing evidence that its outstanding balance of contracts will be within its aggregate rating limit by the time the bid project is scheduled to begin, the Director shall base this determination on the complexity of the bid project, the duration of the bid project and the risk that the State will encounter if the bid is accepted.

The Director ruled that section (c) clearly establishes the balance of payment methodology as the only way to calculate the "dollar value of the contractor's uncompleted contract work." Thus, he concluded that, on its face, section (c) precludes application of the cost-to-complete method used by Paphian in accordance with surety standards. We disagree. Nothing in the text of this rule supports this conclusion. To be sure, the DBC could have enacted a rule establishing the balance of payment calculation method as mandatory in the interest of uniformity. However, it did not do so and therefore, while *N.J.A.C.* 17:19–2.9 is capable of being read to authorize use of such a methodology, it cannot be said to unambiguously require it or to place bidders on notice that other commercially reasonable valuation methods are prohibited. On its face, section (c) simply does not specify any particular methodology for calculating work on hand, and the Director's finding of an express requirement that contractors may only use a balance of payment methodology finds no support in the rule.

This being the case, the Director's characterization of the balance of payments method as the exclusive mode of calculating work on hand suffers from another infirmity. It is *de facto* rule-making, in violation of established principles of administrative law.

Any "agency determination that is intended to be applied as a general standard and with widespread coverage and continuing effect" should ordinarily be adopted through formal rulemaking where the standard is not otherwise "expressly authorized by or obviously inferable from the specific language of the enabling statute." *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313, 329, 478 *A.*2d 742 (1984). Plainly, the Director's adoption of the balance of payments methodology as the exclusive means of determining a bidder's responsibility clearly bears the hallmark of an administrative rule, for it establishes a standard of "general applicability" with "widespread, continuing and prospective effect" which is "not obviously inferable" from the specific language of the regulation, despite the Director's view to the contrary. *Id.* at 328–29, 478 *A.*2d 742; *N.J.S.A.* 52:14B–2(e). Consequently, DBC should have adopted the balance of payments methodology only after following the procedures for formal rulemaking in order to place the industry and the public on notice of its intended action and to afford interested parties a reasonable opportunity to participate in the process of determining which methodology should be adopted. As this record reveals, fair arguments can be made as to the worth of each of the methodologies advanced by the parties. Which is "better" is not the issue before us. The issue is whether the regulation mandates one over the other for purposes of eliminating a bidder as non-responsible. We have concluded that it does not.

Moreover, we note that DBC's determination here represents a material departure from its former policy of accepting a bidder's certification at face value without requiring *any* statement of the value of uncompleted work, let alone a statement prepared according to a specific formula.

As the Supreme Court stated in *Metromedia,* "[w]here an administrative agent is given full rule-making power, he must, in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative, must precede the specific viola-

tion." *Metromedia, supra,* 97 *N.J.* at 329, 478 *A.*2d 742 (quoting *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 155, 183 *A.*2d 64 (1962)). Simply put, this means that if the Director intends to hold a party accountable to a particular standard, which is neither expressed nor inferable from the enabling legislation, he must announce the standard by rule before applying it to a party's detriment.

While an administrative agency may choose, in its discretion, to make policy, in some instances, by adjudication instead of rulemaking, *Crema v. New Jersey Dep't of Environmental Protection,* 94 *N.J.* 286, 298, 463 *A.*2d 910 (1983), this does not eliminate consideration of the fundamental fairness underpinnings of *Metromedia.* Thus, an adjudicatory rule, like a rule enacted in accordance with the Administrative Procedure Act, must be announced before being applied against a party. What this means is that Paphian's certification as to its aggregate rating limit was not, in fact, inaccurate. Further, the Director was required to either accept Paphian's calculation of its work on hand by the cost to complete methodology, which he acknowledged is an accepted standard in the surety industry, or give Paphian an opportunity to recalculate its outstanding work under the newly enunciated contract balance methodology before disqualifying its bid.

He did none of these things. Instead, at Fitzpatrick's urging, he persisted in his conclusion that Paphian's bid should be disqualified because it was accompanied by an "inaccurate" original certification and, concomitantly refused to allow Paphian to recalculate its eligibility for the award of this contract under the after-enunciated balance of payments methodology. More particularly, he refused to consider Paphian's recalculation of eligibility under section (c)(1) of *N.J.A.C.* 17:19–2.12. He reasoned that *N.J.A.C.* 17:19–2.11(c) limited Paphian to the $10,000,000 rating it had on the bid due date and that Paphian was also barred from invoking section (c)(1) because it did not submit evidence *with its bid* that it would be within its aggregate rating limit by the time of the project start.

■ We agree with the Director that *N.J.A.C.* 17:19–2.11(c) [5] governs and that Paphian's bid is to be evaluated under the $10,000,000 aggregate in effect on the date of the bid.

■ The Director read section (c)(1) to require that evidence of a bidder's ability to meet the alternate responsibility standard be submitted in all cases at the time of submission of the contractor's bid. For this reason, he refused to allow Paphian to invoke this provision. It is here that we part company from him again. It is not at all clear to us that this is a correct reading of the section. The alternate methodology seems to us more likely to have been developed as a fallback for a low bidder whose good faith belief that he was within his aggregate rating has been successfully challenged but who will be within his limit by the time of the project start. However, assuming for this analysis that DBC's reading of section (c)(1) is correct, and that a bidder must *ordinarily* choose between section (c) and section (c)(1) qualification at the time of bid, Paphian should not have been precluded in this case from proving (c)(1) qualification after the fact.

There are several reasons for this. As we have said, *N.J.A.C.* 17:19–2.12 does not specify the methodology for calculating work on hand. In good faith (and this is not disputed) Paphian calculated its work on hand by the cost-to-complete method and concluded that, at the time of bid, it was under its aggregate limit. Several months later, upon Fitzpatrick's protest, the DBC first enunciated the mandatory balance of payment rule under which methodology Paphian was over its limit at bid opening. Since DBC's regulations, by their plain text, did not prohibit contractors from adhering to normal surety standards, Paphian's failure to foresee that DBC was going to adopt a mandatory balance of payment methodology for the calculation of uncompleted work, and its resulting

---

[5] *N.J.A.C.* 17:19–2.11(c) reads in pertinent part:

Any classification or rating which, *as of the date of the bid due date,* either has expired or has not yet been assigned, shall not be valid for the bid. (emphasis in the original).

failure to submit proofs under section (c) 1 with its bid, cannot be determinative of the issue of responsibility.

In splitting hairs over whether Paphian could invoke section (c)(1), the Director overlooked the fact that the fundamental issue before him was whether Paphian was eligible to bid under *N.J.A.C.* 17:19–2.12, not whether he was eligible under a particular section of that rule. Thus, based on our view that fundamental fairness compels DBC to allow Paphian to demonstrate its responsibility under the new rule, that entitlement encompasses the right to show eligibility under section (c) or under (c)(1).

Contrary to the State's argument on appeal, this is not a situation involving a defect in Paphian's original bid which it is attempting to ameliorate by a post bid submission. Thus there is no warrant for a waiver analysis. *See Meadowbrook Carting Co. v. Island Heights Borough,* 138 *N.J.* 307, 650 *A.*2d 748 (1994). Paphian's original bid was not defective under then applicable standards. It was the agency's post-bid enunciation of a new method of calculation which upended these proceedings. Further, nothing about allowing Paphian to recalculate under section (c)(1) would offend the principles of the waiver cases. By proving its responsibility as of the date of bid, Paphian would neither deprive DBC of assurance as to performance of the contract nor would it undermine the necessary common standard of competition which is crucial to the integrity of the bidding process. *Id.* at 315, 650 *A.*2d 748. Separate and apart from the fundamental fairness of such a result, it seems to us that this very scenario was contemplated by *N.J.S.A.* 52:35–7 upon which the Director properly relied in characterizing Fitzpatrick's protest as timely. That statute provides:

> Nothing contained in this chapter shall be construed as depriving any state official of the right to reject a bidder at any time prior to the actual award of a contract, where there have been developments subsequent to the qualification and classification of such bidder, which in the opinion of the awarding official would affect the responsibility of the bidder. *Before taking final action on any such bid, the state official shall notify the bidder and give him an opportunity to present any additional information which might tend to substantiate the existing classification.* (emphasis added).

Here, Fitzpatrick's protest, resulting in DBC's enunciation of a mandatory calculation rule, had the retroactive effect of rendering "inaccurate" Paphian's certification that it was within its aggregate limit at the time of bid. These were "developments subsequent to the qualification and classification" of Paphian which raised a question about its responsibility. Paphian was entitled under *N.J.S.A.* 52:35–7 to an opportunity to present additional information to prove its responsibility. Nothing about the production of such proof would impair the integrity of the bidding process or otherwise result in unfair advantage or favoritism. In fact, the denial of such an opportunity would adversely affect the competitive bidding of this project by favoring a contractor who had not submitted proof of the balance of uncompleted contract work over a contractor who provided a full disclosure of its pending contracts.

In sum, we find that the Director acted, not with evil motive but nonetheless arbitrarily in denying Paphian the opportunity to show, in response to Fitzpatrick's challenge, that it could have utilized the contract balance methodology and met the alternative standard of responsibility at the time of bid. Paphian should be allowed to make that showing now. While the record could be read to support the conclusion that Paphian has already done so at the hearing, the Director's statement that it is not clear from the record what effect Paphian's new contract awards would have on its aggregate limit requires that he consider this issue afresh. Again, the increase in Paphian's aggregate limit to $15,000,000 should not be a factor in DBC's assessment. Essentially, what Paphian must now show is that it would have been able to establish, as of the date of bid opening, based on the balance of payment methodology and based on information then known to it, that its bid proposal, when added to the value of its uncompleted contracts as of the projected start date of the DBC project, would not have exceeded its then aggregate rating limit of $10,000,000. If Paphian is able to make the required showing under section (c)(1), it should be awarded the contract.

If Paphian fails to qualify, the Director must review the figures underlying Fitzpatrick's certification that it was under its aggregate rating limit at the time of bid. This is what *N.J.A.C.* 17:19–2.12(c) requires; it is what was required of Paphian; and it is the only way in which the Director's expressed and proper concern over application of a "common standard of competition" can have meaning.

Reversed and remanded.