**UNITED STATES of America and State of New Jersey, Plaintiffs,**

v.

**JOINT MEETING OF ESSEX AND UNION COUNTIES, et al., Defendants,**

**R.J. LONGO CONSTRUCTION CO., INC. d/b/a EPIC and Andrew Cappon, Plaintiffs,**

v.

**PASSAIC VALLEY SEWERAGE COMMISSIONERS, et al., Defendants.**

Nos. CIV. A. 89–3339, 94–4795(HAA).

United States District Court, D. New Jersey.

March 9, 1998.

594

William A. Feldman, Feldman & Fiorello, Wayne, NJ, for Plaintiffs R.J. Longo Construction Co., d/b/a/ EPIC and Andrew Cappon.

Mr. James F. Dronzek, Schumann, Hanlon, Doherty, McCrossin & Paolino, Jersey City, NJ, for Wheelabrator Defendants.

Janyce M. Wilson, Graham, Curtin & Sheridan, Morristown, NJ, for Defendant Passaic Valley Sewerage Commissioners.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court on motions for summary judgment on behalf of both the plaintiffs, R.J. Longo d/b/a/ EPIC ("EPIC") and Andrew Cappon, and the defendants, Passaic Valley Sewerage Commissioners ("PVSC") and the Wheelabrator Defendants.[1] For the reasons detailed below,

plaintiffs' motion is **DENIED** and defendants' motion is **GRANTED**. After its failure in securing a wastewater treatment contract from PVSC, EPIC filed this action against PVSC and the vendor which was awarded the contract, Wheelabrator. The other plaintiff, Andrew Cappon is a resident taxpayer of the City of Newark and a PVSC ratepayer.

### I. Terms Guide

In their papers, the parties have used a number of abbreviated terms and acronyms to refer to significant parties, events, and contract language. To remedy any potential confusion, I think it best to provide the reader with a guide to the terms used in this opinion. The parties involved are:

| Name | Role | Abbreviation or Acronym |
| --- | --- | --- |
| R.J. Longo Construction d/b/a EPIC | Plaintiff | EPIC |
| Passaic Valley Sewerage Commissioners | Defendant | PVSC |
| Waste Management of North Jersey, Inc. | Defendant | WMNJ |
| Wheelabrator Clean Water New Jersey, Inc. | Defendant | WCWNJ |
| Wheelabrator Technologies, Inc. | Defendant | WTI |
| Wheelabrator Clean Water Systems, Inc. | Defendant | WCWS |
| WMX Technologies, Inc. | Defendant | WMX |
| Malcolm Pirnie, Inc. | Consultant to PVSC | MPI |
| New Jersey Department of Environmental Protection | State Administrative Agency | NJDEP or DEP |
| DIVISION of Local Government Services | State Administrative Agency | DLGS |

In addition there are other terms of which the reader should be aware. These terms are:

| Term | Abbreviation |
| --- | --- |
| Request for Proposals | RFP |
| Request for Qualifications | RFQ |
| tatement of Qualifications | SOQ |

---

### II. Background

The facts of this case took place against the backdrop of a joint consent decree of which the Passaic Valley Sewerage Commis-

sioners ("PVSC") became a part in 1989. Through the consent decree, six New Jersey sewerage authorities, including PVSC, were

---

**1.** The Wheelabrator Defendants are: Wheelabrator Clean Water New Jersey, Inc., Wheelabrator Technologies, Inc., Wheelabrator Clean Water

Systems, Inc., and Waste Management North Jersey, Inc.

required to cease ocean dumping and implement long-term alternative systems for land based sludge development. Ultimately, the decree envisioned the implementation of a long term alternative, but in the meantime, it permitted PVSC to enter interim contracts for the management of sewerage sludge. In 1995, this court entered a modified consent decree adopting "beneficial use" as the long-term alternative. Additionally, the modified consent decree required that the procurement process be conducted under the New Jersey Wastewater Treatment Privatization Act, N.J.S.A. 58:27–1 and guaranteed that this court would "retain jurisdiction to enforce [its] terms and conditions."

PVSC initiated the procurement process in which it eventually awarded the contract to the defendant, Wheelabrator. Subsequently, EPIC filed a complaint against PVSC and the Wheelabrator companies alleging violations of the Water Treatment Privatization Act, breach of contract, tortious interference, and legal impossibility. *See* PVSC Appendix at Ex. 1 (copy of Complaint, Counts One through Four). The case was removed to federal court.

Because the Wastewater Treatment Privatization controlled this situation, it is important to understand the process established by the Act. The Act creates a "comprehensive procedure designed to authorize local government units to contract with private firms for the provision of wastewater treatment services." N.J.S.A. § 58:27–5. Under the Act, the PVSC must follow the following procedural steps:

1. Publish notice of its intent to contract, (N.J.S.A. § 58:27–5);

2. Issue a Request for Qualifications ("RFQ") of vendors interested in providing their services (*Id.* at 58:27–6);

3. After reviewing the qualifications submitted by vendors, establish a list of responding vendors and designate those vendors which are qualified to provide the wastewater treatment service, (*Id.* at 58:27–7);

4. Transmit a Request for Proposals ("RFP") to the qualified vendors, which shall include a detailed description of the wastewater treatment system and services required, the format and procedure to be followed ..., the specific information which the vendor must provide in the proposals, a statement setting forth the relative importance of factors, including cost, which the contracting unit will consider in evaluating a proposal submitted by a qualified vendor, and any other information which the contracting unit deems appropriate ... (*Id.* at 58:27–8);

5. Review proposals submitted by vendors and if provided for in the RFP, conduct discussions with qualified vendors to clarify any information submitted in the proposal, (*Id.* at 58:27–9);

6. Designate the selected vendor and include a list of qualified vendors, the basis on which the selected vendor was chosen, and a finding that the selected vendor's proposal is the most advantageous, (*Id.* at 58:27–10);

7. Negotiate with the selected vendor and publish proposed contract, (*Id.* at 58:27–11);

8. Conduct public hearing and comment, (*Id.* at 58:27–12);

9. Approval of the proposal contract by certain state agencies: the New Jersey Department of Environmental Protection for environmental and water quality standards and Division of Local Government Services for the fiscal and financial capabilities of the contracting unit, (*Id.* at 58:27–13); and

10. Award of the negotiated contract after approval.

In 1993, PVSC published its RFQ pursuant to the Privatization Act. The RFQ "solicited Statements of Qualifications ("SOQ's") from companies who have the financial and technical resources to provide comprehensive sludge management services for a Sludge Management System," the "primary goal" being to "develop a cost-effective and environmentally responsible land-based alternative for the sludge produced by PVSC."

Coles Decl., Ex. 6 (copy of RFQ § 1.0). The RFQ further stated that:

> The Vendor may propose a system with a capacity from one dt/d increment to the entire sludge production of PVSC. A single vendor may propose a system which consists of multiple increments with different technologies [as] long as each technology is sized to accept a minimum increment of 50 dt/d. *Id.*

On October 4, 1993, the defendant Waste Management of North Jersey, Inc. ("WMNJ") submitted its Statement of Qualifications ("SOQ"). The SOQ identifies WMNJ as the "Primary Respondent" and Bio–Gro Systems, Inc. as the "Primary Vendor." Subsequently, Bio–Gro changed its name to Wheelabrator Clean Water Systems. Inc. ("WCWS").[2] WMNJ's SOQ indicated that it intended to make proposals based upon "multiple alternatives for beneficial use and recycling of sludge." Wheelabrator Br. at 12. These technologies included:

1. BIO*FIX Alkaline Stabilization
2. Swiss Combi Thermal Pelletization
3. Land Application Reclamation, and
4. Reclamation and IPS Composting.

*Id.*

To assist in the procurement process, PVSC hired Malcolm Pirnie, Inc. ("MPI") for engineering consulting services. *See* PVSC Rule 56.1 Statement at ¶¶ 18–19. MPI played a significant role in evaluating the proposals. On July 13, 1994, based upon MPI's recommendation, PVSC designated twenty vendors as qualified to submit proposals. PVSC required that each proposal be submitted on a stand-alone basis, i.e. a separate proposal for each technology. Of the twenty vendors, only EPIC and WMNJ requested and obtained permission to submit proposals for more than one technology. PVSC authorized EPIC for two technologies, Composting/Mine Reclamation and Land Application, and WMNJ for IPS Composting, Land Application, BIO*FIX Alkaline Stabili-

zation and Swiss Combi Drying/Pelletization. Wheelabrator Br. at 14. On July 14, 1994, the Wheelabrator companies "notified PVSC of the recent formation of WCWNJ, a wholly owned subsidiary of WCWS (the former Bio–Gro ...) to handle water and wastewater businesses within ... New Jersey." *Id.* Essentially, WCWNJ was now responsible for the project.

On September 30, 1994, PVSC commenced the next stage of the procurement process by issuing Requests for Proposals to the twenty-five qualified vendors. There were four separate RFP's issued which differed only to the extent that they each covered a different technology. *Id.* at 15; Plaintiff's Rule 56.1 Statement. Otherwise, they contained identical introductory and general language. *Id.* PVSC qualified WMNJ(WCWS) for four technologies and sent it four different RFP's. On January 6, 1995, WCWNJ submitted separate proposals for each of the four technologies. WCWNJ's proposals identified itself as a "wholly-owned subsidiary created as the operating arm in New Jersey" which would act "the Project's company" with WTI as guarantor. *Id.* at 16–17. Attached to each proposal, WCWNJ made a separate proposal offering a "mix of technologies with a unified price for the beneficial use of all PVSC biosolids without the burden of a put or pay commitment." Additionally, apart from the four proposals, it submitted a fifth one offering to "accept all bio solids generated by the PVSC for a period of 20 years for service for 1995 fees ....without a put or pay." *Id.* Essentially, it offered PVSC an "opportunity to 'benefit from access to each of [the technologies] through a single contractor.'" *Id.*

Subsequently, PVSC, on April 20, 1995, PVSC "short listed" six stand-alone proposals for their designated technology "to attempt to negotiate a Contract or Contracts." Coles Decl. Ex. O. (copy of PVSC Resolution 20). Specifically, PVSC selected WCWNJ for its Land Application and Chemical Stabi-

---

2. In its complaint, in addition to WMNJ, EPIC has also named the following defendants: Wheelabrator Clean Water New Jersey, Inc., Wheelabrator Technologies, Inc., and Wheelabrator Clean Water Systems, Inc. All of these companies are, in some way, related to WMX Technologies, Inc., the "largest solid waste transportation and environmental service company in the world." Throughout the procurement process, each played a role. The role played by each and the degree of their relationship to each other will be further investigated below.

lization (BIO*FIX) technologies, EPIC for its Land Application technology, ECDC Environmental, L.C. for its landfill cover, Hydropress Environmental Services, Inc. for Chemical Stabilization technology, and Sludge Management, Inc. for composting. *Id.* Next, it informed the vendors that it intended to negotiate with all of them.

Regarding WCWNJ, PVSC requested additional information related to two of the proposals, those dealing with Land Application and BIO*FIX. In two separate responses for each technology on June 8, 1995, WCWNJ indicated that " 'the ability to utilize land application or BIO*FIX processing at Wheelabrator's discretion may lower program costs." *Id.* at Ex. U, V (copies of responses). After a second negotiating session on September 15, 1995, MPI asked WCWNJ to "complete forms for their previously proposed combined BIO*FIX and land application proposal for the 50% and 100% base sludge commitments." *Id.* at Ex. Z (copy of draft meeting minutes). Wheelabrator returned these forms to PVSC on September 25, 1995. In its cover letter, Wheelabrator explained that "under the combined proposal options both the ... BIO*FIX Facility and the land application program will be available for utilization of PVSC's biosolids." *Id.* at Ex. DD (copy of letter). Subsequently, when PVSC requested that all vendors submit revised price proposals, WCWNJ submitted three different ones—a separate proposal for the Land Application, BIO*FIX, and the "Combined" technologies. *Id.* at Ex. FF. PVSC never informed the other vendors of its discussions with WCWNJ regarding the proposed technology.

After the third negotiating session, based upon MPI's recommendation, PVSC decided to continue its discussions with ECDC, Sludge Management, Inc. and WCWNJ and to suspend talks with other vendors. Regarding WCWNJ, MPI recommended that PVSC streamline its negotiations with WCWNJ because:

WCWNJ has been participating in the negotiation with two separate proposals with BIO*FIX and Land Application, along with a combined proposal that provides both of these technology options via a single contractual arrangement. During the course of the negotiations, it has become apparent that the WCWNJ's combined proposal is the most advantageous to the PVSC as compared to the other standalon[e] ... proposals.

*Id.* at Ex. EE (copy of November 8, 1995 letter).

PVSC adopted MPI's recommendations. *See Id.* at Ex. KK. Following this decision, PVSC solicited from the three remaining vendors "one final sealed cost proposal."

In December 1995, based upon MPI's evaluation of the proposals, PVSC designated Wheelabrator as the "most advantageous" vendor for its 100% base sludge commitment proposal for land application/chemical stabilization combination. *Id.* at Ex. NN. Thereafter, PVSC gave public notice of its decision and held a public hearing in May 1996. In August 1996, the New Jersey Department of Environmental Protection (DEP) and the Division of Local Government Services (DLGS) approved the proposed contract between PVSC and WCWNJ. PVSC formally awarded the contract to WCWNJ on August 22.

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843 F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The party seeking summary judgment always bears the initial burden of production, i.e., of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not produced evidence relating to an essential element of the issue for which it bears the burden. *Id.*, 477 U.S. at 322–23. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324.

However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations—these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1230 (3d Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id. See also Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].""). "Although a 'scintilla of evidence' supporting the non-movant's case is not sufficient to defeat a motion for summary judgment, it is clear that a district court should not weigh evidence and determine the truth of the matter itself, but instead should determine whether there is a genuine issue for trial." *Country Floors, Inc. v. Country Tiles,* 930 F.2d 1056, 1061–2 (3d Cir.1991).

If the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, then summary judgment may be granted.

## IV. Discussion

Here, the plaintiff and the defendants have filed summary judgment motions. Essentially, EPIC's summary judgment motion is predicated upon its contention that the PVSC violated the Wastewater Privatization Act in five significant ways:

- First, that PVSC improperly solicited a proposal from WCWNJ that utilized a combination of technologies;

- Second, that WCWNJ was not a prequalified vendor and thus, should not have been permitted to participate in the procurement process;

- Third, that the PVSC improperly waived the site control requirements of the RFP and the Modified Consent Decree;

- Fourth, that PVSC improperly waived the requirement that the Selected Vendor obtain A–901 registration; and

- Fifth, that the contract is illusory because its term does not last for at least ten years and because it does not satisfy site control and permitting requirements.

For the most part, there are no factual disputes here. Rather, this case involves questions of law. Thus, defendants' argue, if the court rejects EPIC's arguments, it must grant summary judgment in favor of the defendants.

## A. Solicitation of the Combination Technology

In its motion for summary judgment, EPIC contends that the contract between PVSC and WCWNJ violates the Wastewater Privatization Act because WCWNJ's does not substantially comply with the RFP. Because each of the four RFP's instruct the vendor to limit their proposals to one standalone technology, EPIC asserts that WCWNJ's combination technology is materially a deviation and thus, constitutes a flagrant violation of Wastewater Privatization

Act. For reasons which will be made clear, EPIC's argument is unavailing.

■ Whereas the court must invalidate a contract that materially deviates from the RFP or other requirements of the procurement process, the court may permit a contracting unit to waive nonmaterial deviations. *In the Matter of On Line Games Production,* 279 N.J.Super. 566, 595, 653 A.2d 1145 (App. Div.1995). In a competitive bidding structure, it is imperative that:

> [C]onditions and specifications ... apply equally to all prospective bidders. Otherwise, there is no common standard of competition. Every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on basis different from that afforded the other contenders. So it follows that all bids must comply with the terms imposed, and any material departure therefrom invalidates a nonconforming bid as well as any contract based upon it. If this were not the rule, the mandate for equality among bidders would be illusory and the advantages would be lost.

*Id.* at 590, 653 A.2d 1145.

Deviations are deemed material where their acceptance "frustrat[e] ... the policies underlying competitive bidding," *Id.* (quoting *Terminal Construction Corp. v. Atlantic County Sewerage Authority,* 67 N.J. 403, 412, 341 A.2d 327 (N.J.1975)).

■ In *Meadowbrook Carting Co. v. Borough of Island Heights,* 138 N.J. 307, 650 A.2d 748 (1994), the Supreme Court formulated the following two part test of materiality:

> [F]irst, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements; and
> [S]econd, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.

*Id.* at 315, 650 A.2d 748.

As I have already indicated, (*see* Background, *supra*), in the instant case, PVSC issued four RFP's devoted to each technology. While each RFP focused upon a particular technology, PVSC, through its procurement process, made it abundantly clear that the final solution might utilize a combination of technologies. That does not mean that PVSC necessarily invited vendors to submit combination proposals, but it retained the discretion to implement proposals submitted by a number of vendors and incorporating a number of technologies. First, the RFQ invited vendors to propose a "system which consists of multiple increments with different technologies," (*see* PVSC Appendix, Ex. 6), and in its RFP, PVSC informed vendors that it would "select one or more Proposers" to negotiate and it retained "sole discretion" to enter into an agreement "with one or more Contractor(s) for performing Services on all or a portion of the sludge produced at its plant." *See* Coles Decl, Ex. P. (copy of RFP at 2–1).

The above language anticipates that the ultimate plan might combine more than one proposal and that the details could be resolved through negotiation. Notably, this case might be different if the RFP's had clearly stated that ultimately, PVSC intended to adopt a proposal utilizing only one technology. In that hypothetical case, a combination policy might be considered a material deviation. Here, while PVSC did not necessarily invite combination proposals, it anticipated the possibility that it would select a number of vendors utilizing different technologies.

It is important to understand that EPIC does not dispute that WCWNJ's original responses to the RFP were conforming. WCWNJ submitted four proposals for four separate technologies, all of which undeniably conformed to the RFP. Instead, EPIC focuses upon later submissions and discussions which eventually evolved into WCWNJ's combination proposal.

Contrary to the position taken by EPIC, PVSC did not need to modify its RFP in order for it to accept a combination technology. There is only one reason why PVSC was

able to discuss more than one technology with WCWNJ, namely, that it had already shortlisted the company for two technologies—Land Application and Chemical Stabilization (BIO*FIX). Of the five remaining vendors, WCWNJ was the only with more than one selected solicitation. During the negotiation process, WCWNJ and PVSC began to discuss the possibility of developing a proposal that combined the Land Application and Chemical Stabilization (BIO*FIX) technologies. After the third negotiating session, PVSC became completely disinterested in discussing WCWNJ's stand alone proposal, but still wanted to consider the combination proposal. Finally, PVSC designated the Wheelabrator combination proposal as the "most advantageous."

In its brief, EPIC makes the point that under Section 9, PVSC must notify each qualified vendor in writing "of any ... revision or revisions to the [RFP]" and it must allow those qualified vendors to submit revisions. *See* N.J.S.A. 58:27–11. If it had been notified, EPIC contends, it would have submitted a joint venture proposal with one of the other qualified vendors. *See* PVSC Br. at 23. While that may be true, EPIC did not qualify for more than one technology. That PVSC did not allow EPIC to submit a combination proposal with other vendors does not mean that they were treated unfairly. WCWNJ found itself in the unique position of being approved for two technologies. It did not achieve that position improperly.

■ As defendants correctly note, the Wastewater Privatization Act allows for flexible negotiations. *See* N.J.S.A. 58:27–11. As a general proposition, the term "negotiate" is not "used as a word of art designating any particular method of arriving at a contract price." As the Appellate Division has explained:

It is simply an alternative method distinguishable from rigid bidding procedures which is permitted after a municipality has been unable to obtain a reasonable price through competitive bidding . . . . .

Where negotiation is permissible under the statute the municipality has great flexibility and may use any conceivable business method to accomplish the salutary goal of obtaining the lowest available price. There is no magic or uniform procedure which must be utilized. So long as it is structured to accomplish the purpose of the legislation ... the municipal officials have fully complied with their statutory duty.

EPIC does not dispute that the procurement process allows for a flexible negotiation process, but it submits that the defendant's construction of the parameters of negotiation permits it to effectively ignore the specifications of an RFP. Certainly, the court would not validate a contract resulting from negotiations that undermined the RFP, but for reasons already mentioned, that did not happen here. I find that neither the negotiation process nor the final proposal materially deviated from the RFP.

In *On–Line Games,* the court warned against the waiver of conditions which are capable of becoming a "vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons." *On Line Games, supra,* at 595, 653 A.2d 1145. Such conditions should never be waived. *See Id.* That is not the case here. By adopting a plan which combined two selected proposals which conformed to the RFP, PVSC did not frustrate the policies underlying the competitive bidding structure of the Act. PVSC did not place WCWNJ in a "position of advantage over other bidders." Any advantage that exists was derived by the fact that WCWNJ qualified with two technologies. The court fails to see how either prong of the *Meadowbrook* test has been met. Thus, the solicitation of a combination proposal did not render the contract defective.

## B. *Corporate Structure*

Next, EPIC argues that the PVSC violated the Wastewater Privatization Act by entering into a contract with WCWNJ because that company did not "pre-qualify" to participate in the procurement process. At the time of the original SOQ in October 1993, WMNJ

represented that it would be the "Primary Respondent" and that Bio–Gro (which later became WCWS) would be the primary vendor. Furthermore, it indicated that WMX Technologies, through WTI, would provide the financing as the guarantor of the project. Notably, throughout the changes mentioned below, WTI remained as the Project Guarantor. Additionally, it explained its relationship with WMX and the other Wheelabrator companies. WMNJ is a division of Waste Management, Inc., a wholly owned subsidiary of WMX. *See* Wheelabrator Br. at 10. Bio–Gro Systems was a company that had merged with WTI in 1981 and became, in October 1993, WCWS. *Id.* WMX owns 58% of WTI, which wholly own WCWS. *See Id.* On February 28, 1994, WMNJ informed PVSC that Bio–Gro had changed its name to Wheelabrator Clean Water Systems ("WCWS"). *See Id.* at 12. Furthermore, it designated WCWS as the "Primary Respondent" for purposes of all future submissions and correspondence. *See* Wheelabrator Reply Br. at 1.

On July 14, 1994, WCWS notified PVSC that it had recently formed Wheelabrator Clean Water New Jersey, Inc. ("WCWNJ") as a wholly-owned subsidiary which would be responsible for all water and wastewater business operating within the State of New Jersey. It further requested that PVSC "adjust its records to assure that all future references regarding this project be in the name of Wheelabrator Clean Water New Jersey, Inc. as opposed to [WCWS or WMNJ.]" Wheelabrator Reply Br. at 2. After the RFP's were issued, it was WCWNJ who delivered the four proposals to the PVSC. Each proposal identified WTI as the Project Guarantor.

According to EPIC, the above mentioned changes, specifically, the substitution of WCWS in February 1994 and the substitution of WCWNJ in October 1994, violated the Wastewater Privatization Act. These substitutions, EPIC contends, circumvented the "strict procedural requirements managed by the Privatization Act." To support this claim, EPIC has neither cited any specific provisions of the RFP addressing this issue nor any relevant caselaw. EPIC's argument is

predicated upon general principles of corporate law dealing with such issues as piercing the corporate veil. However, all that EPIC has established is that for purposes of liability, parents and subsidiaries are "distinct legal entities," (*see Ricoh Co. v. Honeywell, Inc.*, 817 F.Supp. 473, 481 (D.N.J.1993)), but that courts may pierce the corporate veil to "prevent an independent corporation from being used to defeat the ends of justice," e.g. where a parent has so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent. *See State, Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983). While the plaintiff has correctly stated principles of corporate law, I do not recognize their relevance. There is no reason to think that any deviation here is material.

■ In the instant case, if the court were to find that PVSC's acceptance of the above mentioned amendments undermined the competitive bidding process, it would be compelled to invalidate the contract. *See On Line Games, supra*, at 595, 653 A.2d 1145. However, it cannot be argued that the changes in the name of the corporate representative served a "a vehicle for corruption or favoritism ... or ... capable of affecting the ability of the contracting unit to make bid comparisons...." *See Id.* Under the test of materiality established in *Meadowbrook, supra*, the court must consider:

> [F]irst, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements; and

> [S]econd, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.

*Id.* at 315, 650 A.2d 748.

In the instant case, the substitution of WCWNJ neither "deprive[d] the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements" or "adversely affect[ed] competitive bidding by placing a bidder in a position of advantage

over other bidders or ... otherwise undermin[ed] the necessary common standard of competition." *See Id.*

Throughout the procurement process, WTI remained as the project guarantor and as MPI noted in its evaluation, the team members of the project were the same. Moreover, all of the corporate entities were controlled by WMX and in the case of WCWNJ, was wholly owned by WCWS, the recipient of the RFP. This is not a situation where a company comes from nowhere and injects itself into the process. WCWNJ is sufficiently related to the original respondents so that no one is exploiting the process for an unfair advantage. Notwithstanding EPIC's arguments, the court cannot identify these changes as material or substantial. EPIC's position is untenable.

### C. Site Control

EPIC also asserts that the PVSC contract is defective because WCWNJ does not exercise control over its sites. Under the RFP:

> The contractor shall provide a Site or sets of Sites in two separate states. the Site or set of Sites ... shall each have the capacity to accept 100 percent of the Base Sludge Commitment for the duration of the Service Period....
>
> The Contractor shall have control of the Sites through direct ownership or via a lease agreement that covers the entire Service Period. In the case of a lease arrangement, the Contractor shall have uninterrupt[ed] access to the Site.
>
> Coles Decl. at Ex. P (copy of RFP for Land Application technology).

There is no question that if the PVSC had waived these requirements, it would have amounted to a substantial and material deviation, thereby invalidating the contract. The defendants do not contend otherwise, but they do claim that there has been full compliance with the RFP.

■ In their defense, the defendants have noted that the Modified Consent Decree mandates that PVSC submit to the DEP in connection with its "long term Sludge management Plan Modification ... proof that the contractor is either the owner of or the permittee for each beneficial use site or facility offered, for the full term of the contract, or otherwise controls access to and utilization, for the full term." EPIC agrees that the language of the RFP comports with that of the Modified Consent Decree. *See* EPIC Br. at 24. According to Timothy Doutt, the Supervising Geologist in the Bureau of Pretreatment and Residuals of the NJDEP, in April 1996, PVSC submitted to the NJDEP a Sludge Management Plan Modification package which, in addition to the contract, included "documentation demonstrating WCWNJ's capability to access beneficial use sites or facilities being offered for the land management of PVSC of PVSC sludge for the full term of the WCWNJ contract." *See* Wheelabrator Reply Br. at 8; Doutt Aff.

Under the Modified Consent Decree, before it could approve the contract, NJDEP needed to find that WCWNJ controlled its sites for the period of the contract term. Therefore, the defendant argues, the NJDEP approval and the evidence of Doutt's statement demonstrate compliance with the RFP and the consent decree. Plaintiff has not submitted and the court sees no reason to believe that the NJDEP decision is arbitrary and capricious. *See In re DBC Project,* 303 N.J.Super. 384, 396, 697 A.2d 131 (App.Div. 1997) (recognizing arbitrary and capricious as standard governing ordinary administrative action). Moreover, Doutt notes that at the time of his statement, July 1997, the NJDEP finds that the PVSC plan still meets the requirements of the Modified Consent Decree. *See* Doutt Aff. Thus, the court rejects plaintiffs' argument here.

### D. A–901 Registration Requirement

■ On February 1, 1995 PVSC, in its "Addendum Number 3," amended the RFP with the following paragraph:

> The Proposer must possess an A–901 Registration, which is either generic and can be used for this project or is issued for this project by the NJDEP 180 days from the time the Proposer is designated a Selected Proposer or November 1, 1995 whichever is earlier. If the Proposer does not possess an A–901, the Proposer shall file an application with the NJDEP by March 1,

1995. By May 1, 1995, the Proposer must provide proof to PVSC that the application with NJDEP is administratively complete. The A–901 Registration must be issued to the entity (including any corporation, joint venture, partnership, or other business entity) which has been designated as a Selected Proposer.

Coles Decl. at Ex. M (copy of Addendum). Under the Solid Waste Management Act ("SWMA"), N.J.S.A. 13:1E–1 to 207, "no person shall hereafter engage or continue to engage in the collection or disposal of solid waste in the State without first filing a registration statement and obtaining [DEP] approval." *Id.* at 13:1E–5(a). The Act, referred to as the "A–901" statute, was enacted for the purpose of "excluding persons from the solid and hazardous waste industries who have 'known criminal records, habits or associations' or who are 'so deficient in reliability, expertise, or competence ... that [their] participation would create or enhance the dangers of unsound, unfair, or illegal practices, methods, and activities in ... these industries.'" *East Penn Sanitation v. Grinnell Haulers, Inc.*, 294 N.J.Super. 158, 171, 682 A.2d 1207 (App.Div.1996) (citing N.J.S.A. 13:1E–126), *cert. denied*, 148 N.J. 458, 690 A.2d 606 (N.J.1997). The applicant must submit a "comprehensive disclosure statement to the DEP and the Attorney General which includes not only a list of any notice of violations, prosecutions, order or license revocations arising out of any solid waste or hazardous waste business, ... but also a description of the [applicant's] experience and credentials' in such business, and '[a]ny other information the Attorney General or the [DEP] may require that relates to the competency, reliability or good character of the applicant.'" *Id.* WCWNJ obtained the necessary A–901 Registration, but EPIC asserts that PVSC improperly waived the requirement with respect to the other Wheelabrator companies.

PVSC relies upon additional language in the original Addendum indicating that Proposer should be "reminded .. to submit documentation ... for 'all project team members.'" Coles Decl. at Ex. M. Notwithstanding the absence of other Wheelab-

rator companies's A–901 Registration, the court does not find the contract defective. The amending language of the RFP clearly states that the "entity which has been designated as a Selected Proposer" should register. Here WCWNJ satisfied the A–901 requirement and thus, I see no reason to invalidate the contract. EPIC's argument that the other Wheelabrator needed to register is unavailing. Initially, I note that the language "all project team members" merely appears in the Addendum and is not a part of the paragraph amending the RFP. Moreover, the language should be interpreted to apply only where there are more than one "Selected Proposers". It would be unreasonable to construe "all project team members" to cover all the Wheelabrator companies.

### E. Termination for Convenience Clause

▇ In Count Four, the plaintiffs maintain that the contract is illusory for two reasons. First, EPIC argues that the contract did not satisfy the site control and permitting requirements. I have already addressed that issue, *supra*, and rejected plaintiff's argument. Second, EPIC posits the contract's "Termination for Convenience" clause violates the RFP and the Modified Consent Decree's requirement that the duration of the agreement be a minimum of ten years. In conformity with the Modified Consent Decree, Article 5 provides that the Agreement "will terminate on the same date as the termination date of any other Service Agreement(s) entered into by PVSC in order to comply with the Modified Consent Decree referenced in this Agreement, but in no event earlier than ten years from commencement of [the] Agreement." Coles Decl. at Ex. PP (copy of Service Agreement). The Service Agreement also contains another clause—"Article 20—Termination for Convenience" which states that PVSC may cancel and terminate the agreement prior to the Contract Date for a fee of $25,000 or during the contract term for a fee in the sum of:

- Fees for Services rendered prior to termination and not yet paid by PVSC
- Any retainage due contractor
- Unamortized Costs, and

• A sum equal to ... $5,060,000.00 reduced by $42,166.67 for each month after Commencement of Operations that the termination occurs

*Id.*

According to EPIC, Article 20 makes PVSC compliance with the ten year term requirement illusory. Plaintiff has not cited any cases in support of its position. Rather, it relies upon two cases which are not related and may be easily distinguished. In *William A. Carey v. Fair Lawn*, 37 N.J.Super. 159, 117 A.2d 140 (App.Div.1955), the court found that a bidder had not complied with specifications regarding a lease for a disposal area. The court found that the bidder had merely obtained a permissive license to use a particular property and thus the agreement was voidable because there was no lease. In *Doyle v. Northrop Corp.*, 455 F.Supp. 1318, 1335–36 (D.N.J.1978), the court invalidated an oral agreement because, among other things, its duration was vague. Here, I do not find that the term of the contract is vague. The Agreement clearly states a fixed term of duration and should be construed as such. With respect to Article 20, it allows for termination of the contract at a substantial penalty and should not be construed as either modifying or eviscerating the duration of the contract. Notably, the Agreement covers situations where the contractor may be found in default, but that EPIC has not relied upon that term in its illusory contract argument.

### F. Defendant's Motion

In light of the foregoing, EPIC is precluded from arguing that the contract is defective. Thus, because there are no genuine issues of material fact, the court shall grant defendants' summary judgment motion with respect to Counts One and Four.

### G. Counts Two and Three

In Counts Two and Three, Plaintiffs allege breach of contract and tortious interference. Plaintiffs' arguments on predicated upon their assertion that the contract violated the

RFP and the Modified Consent Decree. Because, I have already found that the contract violates neither the RFP nor the Modified Consent Decree, the court will enter summary judgment on these counts in favor of the defendants.

### V. Conclusion

For reasons detailed above, plaintiffs' motion for summary judgment is **DENIED** and defendants' motion is **GRANTED**.[3]

---

**3.** In their briefs, defendants made other arguments, e.g. lack of standing, but in light of my decision, I need not consider them.